In the **DISCIPLINARY MATTER INVOLVING Jon E. WIEDERHOLT, Respondent.**

No. S–5736.

Supreme Court of Alaska.

July 8, 1994.

Mark Woelber, Asst. Bar Counsel, Stephen J. Van Goor, Bar Counsel, Anchorage, for Alaska Bar Ass'n.

Robert C. Erwin, Anchorage, for respondent.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON, JJ., and BRYNER, J. Pro Tem.[*]

### OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

The Disciplinary Board has recommended that attorney Jon E. Wiederholt be disbarred because, in one case, he filed a pleading and affidavit stating that his client's judgment had not been satisfied when he knew that the judgment had been satisfied, and, in another case, he forged his client's signature as an endorsement to a check. Having independently reviewed the evidence presented before the Hearing Committee, we agree with the factual findings of the Disciplinary Board, and accept the recommendation that Wiederholt be disbarred.

### II. BACKGROUND

Presented to the Hearing Committee were eight grievances. We set them out in tabular form with a brief description of the charges, the recommendation of the Hearing Committee, and the recommendation of the Disciplinary Board.

| Grievance | Description | Committee Recomm. | Board Recomm. |
|---|---|---|---|
| 1. Cuellar | Improper sexual advances to a client Feb.—March 1987 | Reprimand | Dismiss complaint |
| 2. Metcalfe | Unauthorized signature on a check; threats to disclose client confidences, May—June 1987 | 24–month suspension would be appropriate if conduct were in isolation, but 36–month suspension is appropriate here because of aggravating factors and multiple grievances (reduced to a censure if other grievances warrant disbarment) | Disbarment |
| 3. Satterberg | Profane, abusive and threatening language to opposing counsel, June 8 and 19, 1990 | Reprimand | Reprimand |
| 4. Maloney | Kicking opposing counsel, March 6, 1991 | 3–month suspension (reduced to a censure if other grievances warrant disbarment) | 30–day suspension |

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

| Grievance | Description | Committee Recomm. | Board Recomm. |
|---|---|---|---|
| 5. M/V CONST. | Improper delay of discovery and disruptive tactics in defense of a case, July—October 1990 and March 1991 | 3–month suspension (reduced to a censure if other grievances warrant disbarment) | 30–day suspension |
| 6. Taylor | Direct contact by letter with an opposing party after receiving notice that party was represented by an attorney, Dec. 2, 1991 | Censure | Censure |
| 7. Johnson | Writing threatening letter to unrepresented claimant on behalf of a client, Nov. 7, 1991 | Censure | Censure |
| 8. Nesbett | Filing improper claim on behalf of a client to funds deposited in court and failure to disclose previous execution on judgment by client, July 1990 | 2–year suspension would be appropriate if conduct were in isolation, but disbarment is appropriate here because of aggravating factors and multiple grievances | Disbarment |

 This court reviews recommendations concerning attorney discipline made by the Disciplinary Board independently while giving deference to the findings of the Board. *In re Frost,* 863 P.2d 843, 844 (Alaska 1993); *see also* Alaska Bar R. 22(n), (r). On questions of law and questions concerning the appropriateness of sanctions, this court also exercises its independent judgment. *Id.* at 844.

## III. *DISCUSSION*

### A. *Consolidation*

 The first contention made by Wiederholt is that the eight grievances presented to the Hearing Committee should not have been consolidated in a single hearing. He argues that his right to procedural due process was violated because consolidation prevented the Hearing Committee from evaluating each grievance separately on the merits. We reject these arguments.

Consolidation of grievances against an attorney is a routine practice in Alaska. *See In re Clower,* Supreme Court Case No. S–2463, Order of March 17, 1988; *In re Triem,* Supreme Court Case No. S–1066, Order of August 1, 1985; *In re Simpson,* 645 P.2d 1223 (Alaska 1982); *In re McNabb,* 395 P.2d 847 (Alaska 1964). Consolidation has also been routinely permitted in other states. *Florida Bar v. Shapiro,* 413 So.2d 1184 (Fla. 1982); *In re Crumpacker,* 269 Ind. 630, 383 N.E.2d 36 (1978); *Board of Overseers of the Bar v. Murphy,* 570 A.2d 1212 (Me.1990); *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975). Although there is some danger that multiple grievances will unduly affect a Hearing Committee's perception of a respondent's credibility, this danger is minimized by the de novo review of the record conducted by the Disciplinary Board and by this court. Consolidated hearings, on the other hand, are often more expeditious than separate hearings on separate grievances, and the total time spent in a consolidated hearing will usually be less

than in separate hearings. The latter is a consideration of some importance given that the Hearing Committee and Disciplinary Board members are volunteers who are not compensated for their services.

### B. *The Nesbett Grievance*

Wiederholt's second argument is that the Disciplinary Board's recommendation of disbarment in the Nesbett grievance (set out in Appendix A) is based on an error of law. Wiederholt argues that a judgment creditor who bids in the entire amount of his judgment at an execution sale and is issued a bill of sale still has an unsatisfied judgment "unless the party holding the judgment gets something of value." This position is legally wrong. To the extent that an offset bid is made and accepted at a foreclosure sale, it reduces the amount of the judgment by the amount of the bid. *Fireman's Fund Mortg. Corp. v. Allstate Ins. Co.*, 838 P.2d 790, 796 (Alaska 1992); *Hull v. Alaska Fed. Sav. & Loan Ass'n*, 658 P.2d 122, 124 (Alaska 1983). Where the offset is of the entire judgment, the judgment amount is reduced to zero and is therefore satisfied. *Fireman's Fund* at 795 (citations omitted).

Wiederholt cites authority to the effect that an offset bid on an execution sale which is void is itself void, *A.D.A. Mechanical Services, Inc. v. Goehring*, 707 P.2d 1034, 1035 (Colo.App.1985), and that satisfactions of judgment can under certain circumstances be set aside by motion of the judgment creditor. *E.g., W.F. Conelly Constr. Co. v. L. Harvey Concrete Co.*, 162 Ariz. 574, 785 P.2d 94, 97 (App.1989). Wiederholt does not demonstrate, however, how these rules apply to his conduct. He does not argue that the execution sale was void, only that his client received no value as a result of the sale. Further, he does not contend that he made a motion to set aside the satisfaction resulting from the execution sale.

The essence of the Disciplinary Board's recommendation concerning the Nesbett complaint is that Wiederholt intentionally sought to mislead the court and the other parties of the litigation into believing that no execution sale had ever occurred. This conclusion is valid factually and is not based on an erroneous legal premise.

### C. *The Metcalfe Grievance*

Wiederholt's third argument is that the finding of the Disciplinary Board that Wiederholt "essentially forged" his client's, Metcalfe's, name to the check jointly made out to them was error. (This finding of the Disciplinary Board is set out in Appendix B.) Wiederholt contends that the term "forgery" is a term of art under criminal law which requires an intent to defraud which was neither charged nor proven. We conclude that fraud was both charged and proven.

Paragraph 34 of the Metcalfe grievance alleged after setting forth, among other things, the unauthorized endorsement by Wiederholt of Metcalfe's name, that Wiederholt had "by his conduct toward Ray Metcalfe as set out above ... violated DR 1–102(A)(4), which provides that a lawyer shall not engage in conduct involving deceit, dishonesty, *fraud*, or misrepresentation." (Emphasis supplied.) With respect to proof of fraud, Wiederholt argues that the finding of the Disciplinary Board that he endorsed Metcalfe's name in an effort to gain an advantage over Metcalfe in their fee dispute "falls far short of a finding of fraud...." We disagree. In terms of the crime of forgery, intent to defraud is an intent to engage in deceptive conduct for the purpose of gaining a material advantage over another person. *See Morrison v. State*, 469 P.2d 125, 125 (Alaska 1970); *see also* Alaska Criminal Pattern Jury Instruction 46.990(10). The Board's conclusion that Wiederholt was guilty of forgery is accurate.

### D. *Johnson and Taylor Grievances*

Wiederholt's fourth and fifth contentions relate to the Johnson and Taylor grievances respectively. Since we conclude that the remedy of disbarment is appropriate based on the Nesbett and Metcalfe grievances, considered together and in connection with the

Maloney and M/V CONSTRUCTOR grievances,[1] these contentions are moot.

### E. *Sanctions*

Wiederholt's final contention is that disbarment is inappropriate in this case in light of other cases having certain similarities. The cases are *In re West*, 805 P.2d 351, 360 (Alaska 1991) (attorney counselled client to sign her deceased husband's name on release and notarized the release knowing the signature was false—90–day suspension); *In re Schuler*, 818 P.2d 138 (Alaska 1991) (two-year suspension where lawyer shoplifted a number of cassette tapes); *In re Buckalew*, 731 P.2d 48 (Alaska 1986) (lawyer who embezzled $67,000 from trust accounts to cover up prior malpractice disbarred); *In re Walton*, 676 P.2d 1078 (Alaska 1983) (eighteen-month suspension where attorney fabricated a document which he attached to a complaint); *In re Stump*, 621 P.2d 263 (Alaska 1980) (five-year suspension where attorney falsified evidence and lied about it under oath). Wiederholt argues that his conduct "does not reach the type of deliberate dishonesty found in *Buckalew, Walton* or *Stump*," and therefore, disbarment is an inappropriate remedy.

We do not accept this argument for a number of reasons. First, comparison with *Buckalew* is not useful, as Buckalew was disbarred. Second, neither *Walton* nor *Stump* involved multiple serious grievances as this case does. Third, sanctions in other cases can be no more than indicators of appropriate sanctions in a given case because of inevitable factual differences concerning not only the offense but the offender. *In re Minor*, 658 P.2d 781, 784 (Alaska 1983); *Buckalew*, 731 P.2d at 57, nn. 10 & 11 (setting out factors to be considered by a court imposing sanctions). Fourth, *Walton* and *Stump* were both decided before we instituted our present practice of using the American Bar Association Standards for Discipline as guidelines in determining appropriate sanctions.

The Disciplinary Board adopted in part and modified in part the Hearing Committee's findings and recommendations on sanctions concerning the Metcalfe complaint and the Nesbett complaint. We find that the Disciplinary Board's findings and recommendations are appropriate and we adopt them as reflective of our decision in this case. They are set out in Appendix C with an explanatory note.

### IV. *CONCLUSION*

For these reasons, the respondent is ordered disbarred.

### APPENDIX A

As modified by the Disciplinary Board, the findings and conclusions concerning the Nesbett grievance are as follows. Except as noted, the findings are those of the area Hearing Committee which were adopted by the Disciplinary Board. Language which is crossed out is language of the Hearing Committee which was deleted by the Disciplinary Board. Language which is capitalized is language added by the Disciplinary Board.

83. Bobby Capps and his corporation CBS, Inc. owned a drilling rig located in Kipnuk, Alaska during 1981. Tom Farr took the rig to the vicinity of Kotzebue, Alaska, and allegedly used it without Mr. Capps' permission. Mr. Capps later found Mr. Farr in Anchorage, and Mr. Farr agreed to pay for the rig. Mr. Capps set the fair market value of the rig at $28,000, and Mr. Farr signed [an] instrument agreeing to pay $27,000 or $28,000. Mr. Capps' testimony differs from the details set forth in the documents supplied to the Committee. Mr. Capps testified that he received a confession of judgment for $28,-000, but the complaint filed by Mr. Capps in 1982 states that he received a promissory note for that amount. Also, Mr. Capps testified that he received a $1,000 down payment so that only $27,000 would be left on the amount due. However, all of the documents refer to a $28,000 obligation. Regardless of these minor discrepancies, it appears clear that Mr. Farr and Mr.

---

1. Wiederholt has not disputed the Board's action in the Maloney and M/V CONSTRUCTOR matters.

Capps agreed that Farr would pay approximately $28,000 and would own the rig.

84. By July 1982, Mr. Farr was in default of his agreement to purchase the rig from Mr. Capps. Mr. Capps filed suit in Case No. 3AN 82–5457 and obtained a judgment for $28,000 on August 5, 1982. No mention was made in the complaint about repossession of the rig.

85. On August 10, 1982, execution issued on Mr. Capps' judgment against Mr. Farr, and on November 15, 1982, an execution sale was held by the Alaska State Troopers of a "Drilling Rig and Flex Trac Nodwell." The property was sold to Mr. Capps who entered an offset bid in the amount of $28,000. A Bill of Sale to Mr. Capps dated November 22, 1982, and Return of Service On Writ Of Execution was filed by the Troopers in case 3AN 82–5457. However, no satisfaction of judgment was filed at that time.

86. Evidently, Mr. Capps entered the offset bid without inspecting the property. When he did inspect it after the sale, he discovered that the rig was the same one Mr. Farr had purchased from him and that it was essentially worthless due to deterioration and abuse.

87. In 1990, in *Stepp, et al v. Farr et al.,* 3AN 90–5436, Mr. Farr, Mr. Capps and others were sued in an interpleader action by Archie Stepp, who admitted that he owed money to Mr. Farr but who wanted to pay the money to all of Farr's creditors of record. Mr. Capps retained Mr. Wiederholt, his brother-in-law, to represent his interests.

88. Mr. Capps met with Mr. Wiederholt and explained to him the history of the $28,000 judgment he had obtained against Mr. Farr and the execution sale of the worthless property. Mr. Wiederholt was given a copy of the 1982 Return of Service, which described the execution sale that had taken place.

89. After meeting with Mr. Capps, Mr. Wiederholt sent a demand letter dated July 17, 1990, to the other defendants, including Mr. Farr and Mr. Farr's attorney, Raymond Nesbett. In the letter Mr.

Wiederholt asserted that Mr. Capps was entitled to full payment of the $28,000 judgment. Also on that date Mr. Wiederholt filed an answer and cross claim for Mr. Capps, in which he asserted Mr. Capps was entitled to full payment on the judgment.

90. On July 24, 1990, Mr. Wiederholt filed a motion in the interpleader action for "Verification of Claim and Assertion Thereof Against Judgment Proceeds". In this motion Mr. Wiederholt attempted to levy on the interpleaded funds. In his legal memorandum in support of the motion, Mr. Wiederholt stated in pertinent part:

In the intervening eight years since issuance of the judgment against Mr. Farr et al., Mr. Capps and CBS, Inc. have been unable to secure any satisfaction of the judgment. . . . Earlier execution efforts and attempts at levy were unsuccessful; there were simply no available sources of recovery. . . .

[N]either [Capps] nor CBS, Inc. have recovered any satisfaction as against the August 5, 1982, judgment. . . .

There has been no satisfaction or other remediation of such judgment by Tom Farr, et al. The interpleader funds reflect the first available source of funds from which to satisfy all or part of the Capps/CBS claim.

91. In support of the July 24, 1990, motion, Mr. Wiederholt prepared, and filed the affidavit of Mr. Capps which stated in pertinent part:

[S]ince the date of said final judgment, I have been unable to locate . . . any assets, funds or property which might otherwise be subject to valid execution, levy, or lien as might satisfy any portion of the judgment owed. . . .

[No] part of the judgment issued in August 5, 1982 has been satisfied or in any way reduced by Mr. Farr or any other party.

92. On July 31, 1990, Mr. Nesbett wrote to Mr. Wiederholt and confronted him with the facts of the 1982 execution sale and offset bid. Mr. Nesbett demanded that Mr. Wiederholt file a satisfaction of

judgment on behalf of Mr. Capps and a withdrawal of Mr. Capps' claim in the interpleader action. By letter of August 6, 1990, Mr. Wiederholt stated that Mr. Capps agreed to "execute satisfaction of judgment prepared by" Mr. Nesbett at Mr. Nesbett's client's expense. On August 15, 1990, Mr. Capps executed the satisfaction of judgment prepared by Mr. Nesbett.

93. In September 1990, Mr. Nesbett moved for costs and sanctions against Mr. Wiederholt and Mr. Capps because of what Mr. Nesbett described as the filing of false pleadings. Mr. Wiederholt opposed this motion and attempted to justify the pleadings he had filed on behalf of Mr. Capps by arguing at pages 7 and 8 of his memorandum that Mr. Capps' purchase of his "former property" was not a satisfaction of the judgment because the property purchased turned out to be of no value.

94. Mr. Wiederholt's written response was consistent with what Mr. Capps told Mr. Nesbett. Mr. Capps said that he was advised by attorney friends that his judgment may have been satisfied by the sale and that he informed Mr. Wiederholt of this advice. Mr. Wiederholt then asked Mr. Capps if the equipment was junk and if that was "satisfactory" with him. Mr. Capps replied that the sale was not satisfactory to him, and Mr. Wiederholt then concluded, "Then your judgment isn't satisfied."

95. In his testimony to the Committee, Mr. Wiederholt took a position that contradicts his position in the 1990 sanctions motion. In 1990 Mr. Wiederholt had argued that Mr. Capps was not "satisfied" because the property he purchased at the sale from Mr. Farr was worthless. In front of this Committee, Mr. Wiederholt argued that in the interpleader action he had made a good faith argument on behalf of Mr. Capps based on the theory that at the time of the sale, title to the drilling rig had not passed to Mr. Farr and that Mr. Capps had executed to no effect on his *own* property. Mr. Wiederholt expressed the opinion that somehow Mr. Capps was entitled to both the $28,000 judgment and the drilling rig until he received actual value worth $28,000 at which point he would have to convey the drilling rig to Mr. Farr.

96. The Committee finds that both of the legal theories advanced by Mr. Wiederholt are rationalizations thought of after the fact and are legally indefensible. Mr. Wiederholt has never cited any legal authority for either theory. Most important is the fact that neither theory was presented to the court by Mr. Wiederholt in the interpleader action. In that action Mr. Wiederholt did not advance some new or marginal legal theory, but rather ~~stated as fact that no execution sale had ever occurred~~ (1) DELIBERATELY CRAFTED HIS PAPERS AND HIS CLIENT'S AFFIDAVIT TO LEAD THE COURT AND THE OTHER PARTIES TO THE LITIGATION TO BELIEVE THAT NO EXECUTION SALE HAD EVER OCCURRED AND (2) DELIBERATELY WITHHELD MATERIAL FACTS FROM THE COURT AND THE OTHER PARTIES TO THE LITIGATION THAT WOULD HAVE CLARIFIED THE PAPERS AND AFFIDAVIT ACTUALLY FILED BY MR. WIEDERHOLT. The Committee concludes that Mr. Wiederholt intentionally attempted to deceive the court and the parties to the interpleader action by offering false and misleading legal pleadings and a false affidavit.

### APPENDIX B

The Disciplinary Board adopted the findings of the Committee concerning the Metcalfe grievance without change. The findings are set forth below.

13. During 1986 and 1987, Mr. Wiederholt represented Ray Metcalfe in a suit brought by the Republican Party of Alaska, concerning Mr. Metcalfe's use of the name "Moderate Republican" to describe his candidacy for office.

14. When Mr. Metcalfe first contacted Mr. Wiederholt they reached an oral fee agreement by which Mr. Wiederholt would not charge Mr. Metcalfe for his services but would look only to the opposing party to pay fees in the event Mr. Metcalfe prevailed.

15. Mr. Metcalfe then prevailed at the trial court level; however, the Republican Party sought appellate review. Because the matter had consumed more time than Mr. Wiederholt had expected, he told Mr. Metcalfe that he would not represent him on appeal unless Mr. Metcalfe paid $1,000 to Mr. Wiederholt. Though Mr. Metcalfe felt this demand was in conflict with the previous fee agreement, he stated that he would pay the $1,000 if he had the right to recover the $1,000 plus whatever costs he paid from the fees which might be awarded by the court. Mr. Metcalfe's recovery would come after Mr. Wiederholt received the first $4,000 of recovery. Thus, the agreement was that the first $4,000 of awarded fees would go to Mr. Wiederholt, the next $1,000 plus cost to Mr. Metcalfe, and the balance of awarded fees, if any, would go to Mr. Wiederholt.

16. After prevailing on appeal, Mr. Metcalfe was awarded $10,010.83 in fees on May 8, 1987. By May 22, 1987, the parties had agreed to a partial satisfaction of the fee judgment by which the Republican Party delivered a $7,500 check to Mr. Wiederholt and a promissory note for the balance of the judgment due in one year. The check was made payable to both Mr. Wiederholt and to Mr. Metcalfe.

17. On May 22, 1987, Mr. Metcalfe went to Mr. Wiederholt's office and signed the satisfaction of judgment form. During that meeting Mr. Metcalfe asked if he could go and pick up the check. Mr. Metcalfe testified that Mr. Wiederholt replied that he would pick up the check. Then Mr. Metcalfe asked when he would get his money from the $7,500 being paid. At that point Mr. Wiederholt became very angry and stated that he had had to work so hard to win the case that the former fee agreement was off and that all of the money should go to Mr. Wiederholt. Mr. Metcalfe was shocked by Mr. Wiederholt's display of anger and his refusal to honor the oral fee agreement. He then left Mr. Wiederholt's office.

18. Later on May 22, 1987, Mr. Wiederholt endorsed and deposited the check by signing both his name and that of Mr. Metcalfe's. At the time he signed Mr. Metcalfe's name to the check, Mr. Wiederholt knew that he did not have Mr. Metcalfe's permission to use his name.

19. While Mr. Wiederholt admits to signing Mr. Metcalfe's name without his permission, he claims that at the time he had no knowledge of Mr. Metcalfe's claim to a portion of the money. Mr. Wiederholt's testimony is unbelievable on this point. From an examination of the check, it is obvious that Mr. Wiederholt attempted to simulate Mr. Metcalfe's signature on the back of the check. Yet when asked if he attempted to simulate the signature, Mr. Wiederholt testified that he did not. Furthermore, Mr. Wiederholt testified that at the time he endorsed the check he believed that he was entitled to all of the proceeds and that the check was not his client's money. Yet he attempted to deposit the check in his trust account not his general account. Finally, Mr. Wiederholt testified that the fee agreement on appeal was that the $1,000 payment was not refundable under any conditions. Yet the tape recording made by Mr. Metcalfe of Mr. Wiederholt in May, 1987 shows that Mr. Wiederholt stated at that time that the agreement had been that Mr. Metcalfe could obtain a refund of his $1,000 payment after Mr. Wiederholt recovered his investment of time in the case.

> MR. METCALFE: I'm entitled to my $1,000 that you promised to give me.
> MR. WIEDERHOLT: Ray! Ray! Ray! I'm not—I didn't promise you that, Ray. I didn't promise you that. I promised you would get your $1,000 back over and above my investment.
> MR. METCALFE: Over and above 4,000.

For these reasons and based on the demeanor of Mr. Wiederholt and Mr. Metcalfe, the Committee concludes that Mr. Wiederholt's testimony is false.

20. Leslie Wiederholt, Mr. Wiederholt's wife and secretary, testified that she too heard part of the conversation in which the $1,000 payment was said to be non-refundable. The Committee does not give weight

to her testimony because she was engaged in other duties and merely overheard parts of the conversation. Further, the Committee concludes that she was biased based on her statement that she never heard Mr. Wiederholt lose his temper with a client, which in light of the many examples offered by the witnesses during the hearing, is simply incredible. She also witnessed Mr. Wiederholt forge Mr. Metcalfe's name on the check and said she did not know it was wrong though she knew it was unauthorized.

21. The Committee believes that Mr. Wiederholt essentially forged Mr. Metcalfe's name on the back of the check in order to gain an advantage over Mr. Metcalfe in their ongoing argument over who was entitled to the fees. By having the check under his control, Mr. Wiederholt would be in a more powerful negotiating position.

22. Shortly after depositing the check, Mr. Wiederholt and Mr. Metcalfe engaged in a phone call which was tape-recorded in part by Mr. Metcalfe. Mr. Metcalfe testified that Mr. Wiederholt told him on the phone that their former fee agreement was off and that he would deny that it ever existed. At that point Mr. Metcalfe turned on the tape recorder and recorded the balance of the conversation. The tape recording was played for the Committee and a transcript was provided.

23. The tape recording reveals beyond question that Mr. Wiederholt was so enraged at his client that he was at time out of control. During the call Mr. Wiederholt attempted to intimidate his client, screamed obscenities at him and resorted to a shocking display of unprofessional conduct.

24. Most importantly, during the phone call Mr. Wiederholt threatened to "expose" Mr. Metcalfe if Mr. Metcalfe did not agree to Mr. Wiederholt's terms. Mr. Metcalfe testified that he had done nothing worth exposing but that he was worried that Mr. Wiederholt might make up something. The phone call transcript shows that Mr. Wiederholt made the following threat:

Okay. Ray, fine. Why don't you do this: why don't you call up an attorney, and you tell him to go ahead and file a complaint against me in this, and in the Bar Association. And when we go before them, Ray, I will tell them the nature of the understanding that we had regarding attorneys fees. *I will also tell them, Ray, and I will also make it public, that you did what everyone claimed you did, for the specific purpose of using the name of the word "Republican",* in order to defend myself.

Because, now Ray, if you want that kind of notoriety—if you want the notoriety of now suing your attorney because you are upset with the results you got, Ray—because you seem to think....

25. By his conduct concerning Mr. Metcalfe as set out herein, Mr. Wiederholt violated

DR 1–102(A) A lawyer shall not:

. . . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

DR 1–102(A) A lawyer shall not:

. . . . .

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

Canon 4. A lawyer should preserve the confidences and secrets of a client.

DR 4–101(B) ... [A] lawyer shall not knowingly or after termination of the professional relationship to his client:

. . . . .

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after a full disclosure.

DR 7–101(A) A lawyer shall not intentionally:

. . . . .

(3) Prejudice or damage his client during the course of the professional relationship.

## APPENDIX C

The Board's findings and recommendations on sanctions are set forth below. Except as noted, the findings are those of the Hearing Committee which were adopted by the Disciplinary Board. Language which is crossed out is language of the Hearing Committee which was deleted by the Disciplinary Board. Language which is capitalized is language added by the Disciplinary Board. The reference to the Taylor grievance in paragraph 11 is superfluous to our decision. We give it no weight. In deciding that disbarment is warranted by both the Metcalfe and the Nesbett grievances, considered together with the Maloney and M/V CONSTRUCTOR grievances, we do not adopt the Board's findings to the extent that they suggest that only a censure is warranted in the Metcalfe matter if disbarment is ordered in the Nesbett matter.

### Metcalfe

1. The Metcalfe grievance is centered on two basic acts of misconduct: respondent intentionally forged Mr. Metcalfe's name on a check and deposited it in order to gain an advantage over Mr. Metcalfe, and respondent intentionally threatened to expose Mr. Metcalfe's client confidences if Mr. Metcalfe did not accede to respondent's demands.

2. This conduct violated at least five different discipline rules resulting in breaches of duty to the public, his client, and the legal system. There is no question that respondent acted knowingly and intentionally with the conscious purpose of achieving his wrongful objectives.

3. Counsel for respondent has suggested that the forgery was not a felony because the Committee did not find that respondent intended to defraud anyone nor that respondent intended to commit theft. The Committee rejects this argument. Respondent intended to defraud the bank into accepting the forged endorsement. Furthermore, by depositing the check he may or may not have intended to keep all of the money, but he certainly intended to keep more of the money than he was entitled to and more than he would otherwise have received by way of compromise with Mr. Metcalfe. This is what the Committee meant by saying respondent intended to gain a negotiation advantage. The Committee finds that respondent's conduct would constitute a C felony under Alaska law.

4. After discovering that respondent had forged his name on the check, Mr. Metcalfe went to the bank and signed an affidavit of forgery. The bank intercepted the check and did not honor it. Later Mr. Metcalfe and respondent settled by agreeing that Mr. Metcalfe could have a refund of the $1,000 he claimed to be entitled to, but that Mr. Metcalfe would forgo about $400 in additional costs. Thus, the actual financial injury in this case is not particularly large.

5. The injuries which resulted from this grievance cannot be measured merely by the amount of money lost by Mr. Metcalfe. Mr. Metcalfe suffered repeated and extreme verbal abuse from respondent, and was subject to threats and intimidation that no client should ever have to experience from an attorney. The bank and officials of the Republican party became aware of the forgery and thus respondent's conduct not only seriously adversely reflected on his fitness to practice law, it adversely reflected upon the legal profession as a whole. The Committee concludes that actual as well as potential serious injury occurred as a result of this grievance.

6. ABA Standard section 4.11 states that disbarment is generally appropriate when a lawyer knowingly converts property and causes injury or potential injury to a client. Disbarment is also appropriate if a lawyer engages in intentional dishonesty, fraud or misrepresentation that seriously adversely reflects on his fitness to practice law. Section 5.11. For knowingly dealing improperly with client funds the standards provide for suspension. ABA Standards, Section 4.11.

Because respondent only threatened to disclose client confidences but did not actually reveal them, the ABA Standards are not clear on the recommended sanction for that aspect of the grievance; however, because respondent was intentionally intimidating his client in order to gain a personal financial advantage, the Committee regards the conduct as very serious.

Disbarment is called for when client confidences are revealed with an intent to benefit the lawyer. ABA Standards, Section 4.21. Suspension is called for when confidences are knowingly revealed causing actual or potential injury. *Id.* Section 4.22. The threat here to reveal confidences was certainly made with an intention to benefit respondent. The commentary to Section 4.21 of the Standards provides, "[b]ecause the violation of a client's confidence poses such a serious threat to the lawyer-client relationship, disbarment should be imposed whenever the lawyer acts with intent to benefit the lawyer . . . ." In a very real sense the injury to the client and the lawyer-client relationship here is the same as if client confidences were, in fact, revealed.

7. As a combined sanction for the various violations arising out of the Metcalfe grievance, the Committee finds that, if considered alone, twenty-four months suspension would be the appropriate sanction for these violations.

8. While personal or emotional problems are listed in the ABA Standards as a mitigating factor, the testimony developed at the sanctions hearing concerning respondent's particular mental problems convinces the Committee that his problems may be more of an aggravating factor. Respondent has no remorse and accepts no responsibility for his actions. This is an aggravation factor under the standards. Section 9.2(g). If he cannot see the errors of his ways, any hope for an improvement in his behavior is dim at best. According to the evidence, his prognosis for treatment is not good. However, respondent's misconduct in the Metcalfe [grievance] could be considered a first offense, since it occurred at approximately the same time as respondent was receiving notice of the Cuellar grievance. While *In Re Buckalew,* 731 P.2d 48, 54 (Alaska 1986) does not put great weight on the mitigating factor of a lack of prior offenses, respondent may be given some leeway in the Metcalfe grievance on this basis.

9. The psychological insights offered by Dr. Wolf do not entirely explain the dishonest acts of respondent. Rigidity and paranoia do not equate with respondent's willingness to lie to protect his own interests. For example, respondent wrote to Bar counsel, denied that he ever threatened to expose Mr. Metcalfe, and asserted that the $1,000 was never intended to be refundable. Exhibit 2.10. Yet the tape recording is clear and convincing evidence that respondent's statements are false. He also testified under oath that he did not attempt to simulate Mr. Metcalfe's signature on the check when even a brief examination of the check shows the contrary to be true. False statements during disciplinary proceedings are an aggravating factor under the standards. Section 9.22(f). When it comes to rationalizing his own conduct or to obtaining an objective for a client (as in the M/V CONSTRUCTOR and Nesbett grievances), respondent is basically a dishonest person. Respondent has engaged in gameplaying and semantics when dealing with opposing parties, Bar counsel and this Committee. Unable to understand the basic dishonesty of this practice, respondent is proud of how well he "plays the game" according to the testimony of Linda Cerro in the M/V CONSTRUCTOR grievance. Whether or not this dishonesty is entirely explainable by respondent's personality disorder, such conduct is extremely damaging to the legal system and cannot be tolerated.

10. There is no question in the Committee's mind, nor in Dr. Wolf's mind, that respondent is presently unfit to practice law. Dr. Wolf's suggestion that respondent could practice in a supervised setting is not possible in practical terms. No one supervises another lawyer as closely as respondent would need to be supervised. That kind of supervision exists only over a

law clerk or an assistant that may not practice on his or her own. Probation as a sanction is not practical nor morally appropriate in the present circumstances.

11. As noted above, several aggravating factors apply to this grievance. This grievance involves basic dishonesty which is a pattern of misconduct for respondent. ABA Standards, Section 9.22(c). The Nesbett, Maloney, Taylor and M/V CONSTRUCTOR grievances all involved elements of dishonesty. Respondent has committed multiple offenses some of which are equally or even more serious. Respondent's personality disorder is described as "long standing"; thus, there is every reason for this Committee to believe that the present grievances are not isolated incidents arising out of specific situations. To the contrary, these grievances are likely to be typical examples of respondent's ongoing conduct. Respondent's attempt to rationalize his conduct before this Committee by false statements also aggravates the offense. 9.22(f). As in the other cases, respondent does not acknowledge any wrongdoing. 9.22(g). Lastly, respondent is not a beginner in the practice of law having been admitted in 1983, and his misconduct does not arise out of inexperience. 9.22(i). In light of the aggravating factors and mitigating factors noted by the Committee, ~~the Committee finds that a thirty-six month suspension is the appropriate sanction for the Metcalfe grievance~~ THE BOARD RECOMMENDS A SANCTION OF DISBARMENT. If respondent is disbarred based on other grievances, this sanction should be reduced to a censure; otherwise, it should be imposed to run consecutively with the other sanctions imposed.

**Nesbett**

1. In this instance the Committee found that respondent intentionally attempted to deceive the court and the parties to a pending action by offering false and misleading legal pleadings and a false affidavit. Whether or not the witness knew he was committing perjury, respondent certainly should have known it. This misconduct violated at least six disciplinary rules.

2. Respondent breached duties owed to the public and to the legal system. The conduct was intentional. Though respondent's deception was uncovered by Mr. Nesbett before the court acted upon respondent's pleadings, Mr. Nesbett's client was injured by being required to pay Mr. Nesbett's fees.

3. One of the most important duties of a lawyer is to maintain the standards of personal integrity upon which the community relies. See commentary to Section 5.0 of the ABA Standards. Intentional violation of this duty by dishonesty, fraud and misrepresentation that seriously reflects adversely on the lawyer's fitness to practice warrants disbarment. ABA Standards Section 5.1. Disbarment is also appropriate when a lawyer intentionally submits a false document to the court causing potentially serious injury. ABA Standards Section 6.1. In this case, respondent deliberately attempted to obtain money for a client (respondent's brother-in-law) by dishonest conduct in court. This incident did not arise out of anger or respondent's loss of self control. Respondent's initial conduct of submitting false information to the court seems unrelated to his personality disorder, though his combative reaction to being accused was typical.

There are not mitigating factors that apply to this grievance. Agreeing to a client's demand for certain improper behavior is specifically not a mitigating factor. Section 9.4(b). Even if it were, the evidence here showed that the client was less of a motivating factor than respondent.

Several aggravating factors are present: dishonest or selfish motive, Section 9.22(b); a pattern of misconduct, Section 9.22(c); multiple offenses, Section 9.22(c); false statements, or other deceptive practices during disciplinary process, Section 9.22(f); and absolute refusal to acknowledge the wrongful nature of his conduct, Section 9.22(g).

If this were an isolated first instance, perhaps the appropriate sanction would be

a two year suspension. However, by the time this conduct occurred, respondent had at least three other pending grievances including the serious charges in the Metcalfe grievance. In light of the aggravating and mitigating factors discussed above and in the Metcalfe grievance, the Committee finds that disbarment is the appropriate sanction in this instance.