In the REINSTATEMENT Matter Involving Jon E. WIEDERHOLT, Petitioner.

No. S–12785.

Supreme Court of Alaska.

March 28, 2008.

As Modified on Denial of Rehearing May 19, 2008.

Terry C. Aglietti, Aglietti, Offret & Woofter, Anchorage, for Petitioner.

Stephen J. Van Goor, Alaska Bar Association, Anchorage.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

PER CURIAM.

Jon E. Wiederholt was disbarred by order of this court in 1994.[1] He unsuccessfully petitioned for reinstatement in 1999, 2002, and 2005.[2] In 2006 Wiederholt again petitioned for reinstatement. A panel of the Area Hearing Committee conducted an evidentiary hearing and recommended that he

1. *In re Wiederholt,* 877 P.2d 765 (Alaska 1994).

2. *In re Reinstatement of Wiederholt,* 24 P.3d 1219 (Alaska 2001); *In re Reinstatement of Wiederholt,* 89 P.3d 771 (Alaska 2004). Wiederholt's 2005 petition for reinstatement was rejected without opinion as untimely under Alaska Bar Rule 29(b) which requires the expiration of at least two years from the effective date of any order of the court denying reinstatement before a new petition may be filed.

be reinstated.[3] The Disciplinary Board rejected this recommendation and recommends that Wiederholt not be readmitted.[4]

Under Alaska Bar Rule 29(c)(2) it is incumbent upon this court to either accept or reject the recommendation of the Disciplinary Board concerning a reinstatement petition. We exercise our judgment concerning a recommendation independently, and also independently review the entire record.[5] But we afford great weight to the Board's findings of fact.[6] "The deference owed to such findings derives from the responsibility to conduct disciplinary proceedings which this court has delegated to the Bar Association."[7] There is a presumption against reinstatement after disbarment[8] and the petitioner has the

> burden of demonstrating by clear and convincing evidence that (s)he has the moral qualifications, competency, and knowledge of law required for admission to the practice of law in this State and that his or her resumption of the practice of law in the State will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive of the public interest[.] [9]

Wiederholt made a persuasive showing before the Area Hearing Committee that he satisfied the requirements of Bar Rule 29(c). This court is particularly impressed by his record of community service as an emergency medical technician.[10] But after hearing Wiederholt's testimony, the Disciplinary Board concluded in essence that Wiederholt lacks insight into the reasons for the conduct that led to his disbarment. The Board was therefore unable to conclude that Wiederholt's reinstatement to the bar would not be detrimental to the administration of justice or subversive of the public interest.

In light of the customary deference afforded by this court to the Disciplinary Board's findings, and in view of the presumption against reinstatement and the heavy burden imposed on a petitioner seeking reinstatement, this court accepts the recommendation of the Disciplinary Board.[11]

The petition for reinstatement is DENIED.

BRYNER, Justice, not participating

EASTAUGH, Justice, with whom CARPENETI, Justice, joins, dissenting.

EASTAUGH, Justice, with whom, CARPENETI, Justice, joins, dissenting.

Disbarred attorney Jon Wiederholt again petitions for reinstatement and this court, accepting the adverse findings and recommendation of the disciplinary board, again denies his petition. Because I do not agree with the disciplinary board's adverse findings, I respectfully dissent from the court's acceptance of the board's recommendation. In my view, the proper result is Wiederholt's conditional reinstatement.

After conducting a 2006 evidentiary hearing at which eight witnesses (including Wiederholt) testified in person, the area hearing committee issued thorough findings, conclusions, and recommendations. Applying the appropriate multi-factor test,[1] the area hear-

---

**3.** One member of the three-member panel dissented.

**4.** Three members of the nine-member Disciplinary Board dissented.

**5.** *In re Reinstatement of Wiederholt,* 24 P.3d at 1222; *In re Wiederholt,* 877 P.2d at 767.

**6.** *In re Reinstatement of Wiederholt,* 24 P.3d at 1222.

**7.** *Id.*

**8.** *Id.* at 1223–24.

**9.** Alaska Bar R. 29(c)(1).

**10.** In addition to his full-time job, Wiederholt works three evening shifts per week (6:00 p.m. to 6:00 a.m.) as an emergency medical technician in the Matanuska–Susitna Borough.

**11.** The Findings, Conclusions and Recommendation of the Disciplinary Board and the opinion of the dissenting members of the Disciplinary Board are attached as Appendix A. We have edited Appendix A to conform to this court's style and formatting requirements and have omitted internal citations.

**1.** *In re Reinstatement of Wiederholt (Wiederholt II ),* 24 P.3d 1219, 1224–25 (Alaska 2001) (discussing reinstatement standards listed in *In re Pier,* 561 N.W.2d 297, 301 (S.D.1997)).

ing committee recommended reinstatement. Among other things, it found that Wiederholt had "established his acceptance of his past wrongdoing with honesty and sincerity"; that by clear and convincing evidence Wiederholt had proved he "has the present moral fitness to be reinstated to the practice of law"; and that by clear and convincing evidence he had established that his resumption of the practice of law would not be detrimental to the bar or the administration of justice, and would not subvert the public interest. It therefore recommended reinstatement. The area hearing committee was not unanimous; one member dissented.

After reviewing the area hearing committee's findings and recommendations and questioning Wiederholt in person, the disciplinary board in 2007 recommended against reinstatement.[2] It did so because it ultimately was "unable to find that Mr. Wiederholt accepts his wrongdoing with honesty and sincerity, or that he has the present moral fitness to be readmitted to the practice of law." The disciplinary board accepted all of the area hearing committee's findings, except those on the topics of acceptance of wrongdoing with honesty and sincerity, present moral fitness, and proof that Wiederholt's return to

practice would not be detrimental to the bar or the public. As to those topics the disciplinary board made its own findings. They were unfavorable to Wiederholt. Three disciplinary board members dissented; they recommended reinstatement "subject to a reasonable period of supervised practice."

My starting point is the standard of review. *In re Reinstatement of Wiederholt (Wiederholt II )* held that the disciplinary board's findings of fact are entitled to "great weight."[3] But we also recognized in that case that this court "has the authority, if not the obligation, to independently review the entire record."[4] And we also stated that "[w]hen deciding appropriate punishment, we need not accept the Disciplinary Board's recommendation but may exercise independent judgment."[5] I agree with the position taken by Justice Carpeneti, who, in dissenting from this court's 2004 decision denying reinstatement to Wiederholt, would not have given the disciplinary board's factual findings the usual "great weight" because we review disciplinary board recommendations de novo and because, unlike the area hearing committee, the disciplinary board "saw and heard none of the witnesses except Wiederholt."[6]

**2.** This is the second decision of a divided disciplinary board that does not follow a recommendation of the area hearing committee to reinstate Wiederholt. *In re Reinstatement of Wiederholt (Wiederholt III )*, 89 P.3d 771, 793–94 (Alaska 2004) (three-member area hearing committee unanimously recommended reinstatement; seven members of eight-member disciplinary board recommended against reinstatement). Today is also the second time our court has been divided on the issue of Wiederholt's reinstatement. *Id.* (two-one decision).

**3.** *In re Reinstatement of Wiederholt (Wiederholt II )*, 24 P.3d 1219, 1222–23 (Alaska 2001) (discussing reinstatement guidelines).

**4.** *Id.* at 1222. We stated:

With regard to the review of the Disciplinary Board's findings of fact, we view reinstatement as part of attorney discipline. We therefore employ the same standard used in reviewing attorney discipline proceedings:
*Though this court has the authority, if not the obligation, to independently review the entire record in disciplinary proceedings, findings of fact made by the Board are nonetheless entitled to great weight.* The deference owed to

such findings derives from the responsibility to conduct disciplinary proceedings which this court has delegated to the Bar Association. Where findings of fact entered by the Board are challenged on appeal to this court, ... the respondent attorney bears the burden of proof in demonstrating that such findings are erroneous.... As a general rule, moreover, we ordinarily will not disturb findings of fact made upon conflicting evidence....

*Id.* at 1222–23 (emphasis added, footnote omitted) (quoting from *In re Triem,* 929 P.2d 634, 640 (Alaska 1996)).

**5.** *Id.* at 1223; *cf. Wiederholt III,* 89 P.3d at 795 (Carpeneti, J., dissenting).

**6.** *Wiederholt III,* 89 P.3d at 795 (Carpeneti, J., dissenting):

Because this court reviews the board's recommendations de novo, and because the board saw and heard none of the witnesses except Wiederholt, I am not inclined to give to the board's factual findings the "great weight" we customarily give to them, to the extent that they are based on an assessment of witness credibility.

In my view, the customary deference given the disciplinary board's findings should not supersede the exercise of our independent judgment on reinstatement matters. That is especially so here because the area hearing committee heard eight witnesses in person, including Wiederholt, whereas the disciplinary board heard only one witness, Wiederholt; the disciplinary board was not in a superior position to the area hearing committee to assess all the evidence.

It is also useful to note how the relevant evidence came to the disciplinary board. The area hearing committee heard live testimony from witnesses who favorably addressed, among other things, Wiederholt's remorse and acknowledgment of wrongdoing. The area hearing committee issued a twenty-five page document containing its findings, conclusions, and recommendations; attached was one member's nine-page dissent.[7] At its hearing, the disciplinary board's members heard arguments from Wiederholt's lawyer, who then, without first directly examining Wiederholt, made Wiederholt available to answer any question of the disciplinary board's members. Although it is true that disciplinary board members asked Wiederholt "very pointed" questions and that his responses were not necessarily compelling, I do not regard his answers to be "vague" and "equivocal"—as the disciplinary board characterizes them—and thus damningly unpersuasive.

The disciplinary board reasons that Wiederholt "could have been expected to formulate the best possible answer to the fundamental question, what did you do wrong and how do we know you won't do it again." But the peculiar way Wiederholt was offered to the disciplinary board to answer its questions left him without the usual opportunity on direct examination to begin his testimony with answers logically addressing each of the reinstatement criteria.[8] What instead occurred was a form of group cross-examination in which eight of the nine disciplinary board members took turns asking him questions. Nonetheless, I read most of his testimony to confirm unequivocally and directly the area hearing committee's findings on his remorse and recognition of wrongdoing. A few passages are less direct, but in context, his testimony before the disciplinary board convinces me that Wiederholt indeed recognized that his conduct had been wrong (and even recognized that he had been wrong to previously minimize his misconduct), that he was indeed remorseful, and that he poses no risk of future misconduct.

The disciplinary board's decision to recommend against reinstatement appears to be based on Wiederholt's extemporaneous responses to the board's questions regarding the forgery of a client's endorsing signature on a check.[9] In response to the disciplinary board's questions, Wiederholt, among other things, stated:

> The long and the short of it was—is that I—the money wasn't his. The method by which I chose to get it back, to keep it, was what was—that was what was unethical. I don't believe to this day that [my client] was entitled to the money. What I should have done is sequester—a fee arb with him, that's what I should have done. It was a quick and efficacious way, or so I thought, to deal with it.

The disciplinary board interpreted this particular response as evidence of Wiederholt's "present inability to see, or to articulate, the wrongness of his conduct" and stated that Wiederholt "expresses no remorse at how his conduct affected his own client."[10] It interpreted this testimony as indicating that Wiederholt still fails to recognize that the fee money covered by the check was not "his."

*Id.*

7. I am attaching as Appendix B the entire area hearing committee document, with the dissent, to give readers a more complete picture of the evidence considered by that committee and available to the disciplinary board and this court. Appendix B has been edited to conform to this court's style and formatting requirements.

8. *Wiederholt II,* 24 P.3d at 1224–25.

9. *In re Wiederholt (Wiederholt I),* 877 P.2d 765, 766–68 (Alaska 1994) (discussing facts of forgery of client's signature as endorsement to check).

10. One member of the disciplinary board's majority described Wiederholt's testimony as honest, frank, and accepting: "Have you talked to your children about [the forgery and subsequent disbarment] in the same tone and frankness and acceptance and honesty that you're currently talking to us about it?"

I disagree with these findings. Even taken in isolation, his particular answer should not foreclose reinstatement. And taken in context, it certainly should not do so. Wiederholt's testimony before the disciplinary board does not show that he lacks remorse for his actions or that he fails to recognize his earlier wrongdoing. When the disciplinary board asked Wiederholt whether he had a problem admitting to the conduct that led to his disbarment he replied "no." And when asked whether he would repeat the behavior that led to his disbarment, Wiederholt stated that he would not: "I can give you my word that I'm a much better person than I used to be.... I'm kinder and gentler and I'm more reasonable...."

Furthermore, the record before the disciplinary board, and this court, shows that Wiederholt is remorseful—and not merely remorseful about getting caught and disbarred. Wiederholt testified before the area hearing committee as follows:

Q: In the October 2002 hearings, you expressed remorse over each of the incidents. Do you still feel that way today? Do you honestly and sincerely regret the harm that you caused to a variety of different people-the lawyers, the clients, the court, the Bar, the public?

A: I regret ... two things. I regret the harm that it caused and I think in some sense to a greater degree, what I regret more so is my inability to see that.

His affidavit supporting his reinstatement petition also shows remorse: "I have no words to express my regret for my errors in judgment. I remain true to my offer of profound remorse for the conduct precipitat-ing these proceedings." And, in light of his lengthy contextual discussion of the forgery, his responses to the disciplinary board's questions, if occasionally imperfect, were appropriate and unremarkable. In my view, Wiederholt answered the disciplinary board's questions in the context in which they were posed and his answers do not in context reveal that he was not taking responsibility for what he did, including the forgery.

If members of the disciplinary board had doubts about whether Wiederholt was truly remorseful, one would expect specific questions addressing that issue. Each member of the disciplinary board had an opportunity to ask Wiederholt questions. Eight members did so, but because no members specifically asked him about remorse, Wiederholt should not be faulted for any perceived failure to demonstrate remorse beyond what the record, including his area hearing committee testimony, already demonstrated.[11]

Moreover, it also seems significant that bar disciplinary counsel, who was articulate and forceful in protecting the public's interest at all earlier stages of the disciplinary proceeding and Wiederholt's multiple reinstatement proceedings, was neutral before the area hearing committee and the disciplinary board,[12] and presented the disciplinary board's position to us without personally urging denial of reinstatement.

Because the record contains ample evidence of Wiederholt's remorse and acknowledgment of his wrongdoing, I think that the disciplinary board's recommendation should not be given deference. In my independent judgment Wiederholt has met the requirements for reinstatement under Alaska Bar

---

11. The disciplinary board also implicitly seemed to fault Wiederholt for failing to realize that what he thinks he should have done ("sequestered" the money and taken it to fee arbitration) was not an available remedy, i.e., that he still does not realize how he should have dealt with the dispute. Assuming ignorance of an appropriate remedy is an ethical lapse, it could not justify denial of reinstatement.

12. Bar disciplinary counsel testified before the disciplinary board that his position on Wiederholt's reinstatement is neutral:

I've been with this case from day-one. Okay? I formed an opinion, as bar counsel. That opinion has been expressed in the charges that were brought; in the positions that the bar has taken, and so forth. I don't think, in anything other than perhaps an inconsequential procedural motion or other matter in front of this board, or in front of the Supreme Court, that I've ever said "I'm neutral," or "I'm not taking a position." ... This is the first—one of the— if not the first time I've said, "I can't take a position."

Rule 29(c) and *Wiederholt II*.[13] The record shows that Wiederholt has diligently worked on his rehabilitation, that he is remorseful, that he accepts responsibility for his actions, that he is not still at risk of committing a new forgery, and that, for the first time, bar disciplinary counsel is not personally advocating for denial of reinstatement. To me, the evidence discussed by the area hearing committee is persuasive.

For these reasons I respectfully dissent from the court's opinion.

## APPENDIX A

### BEFORE THE ALASKA BAR ASSOCIATION
### DISCIPLINARY BOARD

In The Reinstatement Matter Involving

JON E. WIEDERHOLT,

Petitioner.

---

ABA Membership No. 8312172

ABA File No. 2006R001

### FINDINGS, CONCLUSIONS AND RECOMMENDATION OF DISCIPLINARY BOARD

This reinstatement matter came before the Disciplinary Board of the Alaska Bar Association on January 25, 2007. The Board, having considered the report of the area hearing committee filed October 31, 2006, and the presentation of the parties, hereby denies Mr. Wiederholt's request for reinstatement for the reasons set forth below.

### FACTUAL BACKGROUND

The procedural history of this matter is restated in detail in the Findings of Fact, Conclusions of Law and Recommendations of Area Hearing Committee. On January 25,

2007 the matter came before the Disciplinary Board for hearing. On that date, the Board denied the request for reinstatement, with an opinion to follow.

### STANDARD OF REVIEW

While the Area Hearing Committee is charged with making findings, conclusions, and recommendations in this matter, the Disciplinary Board must review its findings and recommendations *de novo* and may, if it determines to do so, make its own findings, conclusions, and recommendations.[1]

### FINDINGS OF FACT

The Area Hearing Committee did not make separate findings of fact. Its findings are contained within its conclusions of law, under its analysis of the factors to be considered on a petition for reinstatement. The Disciplinary Board accepts all of these findings, with the exception of paragraphs 4.g., i., and j. These items will be discussed in detail below.

### CONCLUSIONS OF LAW

The legal standard to be applied to a petition for reinstatement after disbarment have been restated and refined during the long history of this case. The Supreme Court has adopted a presumption against reinstatement.[2] In order to be reinstated, the disbarred attorney must show by clear and convincing evidence that he or she meets the requirements of Alaska Bar Rule 29(c)(1), which are "moral qualifications, competency, and knowledge of law … and that his or her resumption of the practice of law in … the State will not be detrimental" to the Bar or the public.[3] The Court also adopted the analysis of the South Dakota Supreme Court set forth in *In re Pier*[4] to evaluate whether the applicant meets these criteria.[5] This

---

**13.** Alaska Bar R. 29(c) (discussing reinstatement); *Wiederholt II*, 24 P.3d 1219 (Alaska 2001).

**1.** *See* Alaska Bar R. 29(c)(2); Alaska Bar R. 10(c)(5).

**2.** *See In re Reinstatement of Wiederholt*, 24 P.3d 1219, 1224 (Alaska 2001) (*Wiederholt II* ).

**3.** *See id.* at 1225 (quoting Bar Rule 29(c)(1)).

**4.** 561 N.W.2d 297 (S.D.1997).

**5.** *See Wiederholt II*, 24 P.3d at 1223–24 & n. 14.

analysis has been referred to as the *Pier* review.[6] In this case, the Hearing Committee analyzed the facts within the framework of the *Pier* criteria.

After reviewing the entire record, and considering the arguments and testimony of counsel and Mr. Wiederholt at the hearing before the Board, the Board makes the following findings and conclusions on: a) acceptance of wrongdoing with b) honesty and sincerity; present moral fitness; and c) proof that the Petitioner's return to the practice of law will not be detrimental to the integrity and standing of the Bar or the administration of justice, or subversive of the public interest. As to the other *Pier* factors, the Board adopts the findings and conclusions of the committee.

### A. Acceptance of wrongdoing with honesty and sincerity.

The Area Hearing Committee majority concluded that "Mr. Wiederholt established his acceptance of his past wrongdoing with honesty and sincerity." The majority of the committee found that his witnesses believed him to be sincere in his remorse, and that he now appreciated that he had previously demonstrated an "inability to see how his conduct affected others." This Board disagrees.

The Board elicited additional testimony from Mr. Wiederholt at the January 25 hearing on the issue, particularly, of the Metcalf matter. The Metcalf matter involved a check issued to the client, Mr. Metcalf, and his attorney, Mr. Wiederholt, for partial attorney's fees awarded to them against the Republican Party. Mr. Wiederholt first became involved in a heated verbal dispute with Mr. Metcalf over the fees, then forged Mr. Metcalf's name to the joint check in order to be in a better position to obtain the fees he believed were owed to him. At this latest hearing before the Board, Mr. Wiederholt was asked how it was he came to forge the client's signature on a check made out to the client and to himself, and how he views his

conduct now. Mr. Wiederholt testified that the reason this misconduct occurred was his "inability to see a bigger global picture. How my actions affected more than just my relationship between me and Mr. Metcalf." He further testified that

> [t]he long and the short of it was—is that I—the money wasn't his. The method by which I chose to get it back, to keep it, was what was—that was what was unethical. I don't believe to this day that Mr. Metcalf was entitled to the money. What I should have done is sequester—a fee arb with him, that's what I should have done. It was a quick and efficacious way, or so I thought, to deal with it.

Mr. Wiederholt's testimony on this subject, taken together with other statements he has made on this and other subjects over the history of this case, leads the Board to conclude that Mr. Wiederholt has not shown by clear and convincing evidence that he accepts his wrongdoing with "honesty and sincerity." His statement that the problem arose from his inability to see the bigger picture illustrates his present inability to see, or to articulate, the wrongness of his conduct.

One of the issues in the Metcalf matter was that the dishonest and aggressive manner in which he dealt with the fee dispute was aimed not at an opposing party but at his client, to whom he owed the greatest ethical duty of loyalty. The harm done in that instance was not so much the "global picture" or how his actions affected "more than just [the] relationship between [him] and Mr. Metcalf." His conduct was directed at his client, whom he threatened and from whom he attempted to obtain money by fraud.[7] The original hearing committee concluded that the money in question was *not* Mr. Wiederholt's, but Mr. Metcalf's, a fact Mr. Wiederholt apparently continues to dispute. Mr. Wiederholt now expresses no remorse at how his conduct affected his own client or how it was inconsistent with his ethical duty to his client; his remorse is directed at how his conduct reflected on the

---

6. *See In re Reinstatement of Wiederholt*, 89 P.3d 771, 773 (Alaska 2004) (*Wiederholt III*) (text of Disciplinary Board decision adopted by the Court).

7. *See In re Wiederholt*, 877 P.2d 765, 768 (Alaska 1994) (*Wiederholt I*).

legal profession, and how it affected others outside the relationship with his client. He plainly continues to feel at least somewhat justified in his conduct with respect to his client, because "the money wasn't his." [8] He never expresses understanding or regret that he created a situation between himself and his own client where he first cursed his client over the issue of whether and how much he should be paid,[9] then forged his client's signature in order to ensure that he was paid.[10] There were many ways in which he could have avoided the fee dispute, by reducing the agreement to writing, for example. Even now, in 2007, his view of the matter is that "[t]he method by which I chose to get it back, to keep it, was what was—that was what was unethical. I don't believe to this day that Mr. Metcalf was entitled to the money." When asked directly how he could have made the mistakes he did in the first place, he responded in part that "there were all kinds of reasons at the time that that seemed like the right thing to do . . . . It was an inability to see the whole picture."

A similar concern is raised by Mr. Wiederholt's statement to the Board that "Dr. Wolf, in all candor, left the last hearing telling my counsel that he thinks he might have made a mistake back in 1992, at the first hearing." Dr. Wolf did not testify to this on the record. Mr. Wiederholt's statement seems to be one more attempt to minimize or re-frame his ethical lapses, without fully appreciating the harm that he caused.

The Board remains unconvinced that Mr. Wiederholt's conviction that "but for my excesses, I believe that I was a good lawyer . . ." demonstrates a real understanding of the harm he caused in the Metcalf matter and in other matters, or a genuine feeling of remorse that he came to cause harm. This conclusion is not much different than, although based on different evidence, the conclusion reached by the Supreme Court in *Wiederholt II*.[11]

### B. Present moral fitness.

Present moral fitness is inextricably related to acceptance of wrongdoing. As this body has previously observed, Wiederholt's "failure to acknowledge wrongdoing in the face of overwhelming evidence to the contrary is evidence that Petitioner has no 'greater understanding of his responsibilities as an attorney for "trust, candor and honesty" than he did at the time of disbarment.' " [12] The Board's reasons for finding that Mr. Wiederholt's appreciation of his own wrongdoing is inadequate lead us also to the conclusion that his current moral fitness to practice law has not been proven by clear and convincing evidence.

The Hearing Committee relies on certain facts to support its conclusion that moral fitness has been established to its satisfaction. These include the satisfaction of his current employer with his performance as a paralegal; his performance in his volunteer work as an EMT; and Dr. Wolf's professional opinion that Mr. Wiederholt's mental health has improved since 1992. While all of these are admirable and evidence that Mr. Wiederholt is avoiding, in his current life, the types of misconduct for which he was disbarred, it is insufficient under the circumstances, as this body previously observed: "disbarment conclusively proves lack of moral fitness to practice law at the time of disbarment and, while not determinative in reinstatement, it continues to be evidence of lack of moral fitness at later times." [13]

Most important to the Board's finding in this respect is Mr. Wiederholt's continuing inability to articulate, in response to very

---

8. The Board notes that Mr. Wiederholt also stated that he should have sequestered the money and taken the client to fee arbitration. In fact, there is no such procedure. Fee arbitration can only be initiated by the client. *See* Alaska Bar R. 40.

9. *See Wiederholt I*, 877 P.2d at 773 (Findings of the Disciplinary Board).

10. *See id.* at 772.

11. *See* 24 P.3d at 1229–30.

12. *Wiederholt III*, 89 P.3d at 778 (Conclusions of Law of Disciplinary Board) (quoting *In re Costigan*, 541 Pa. 459, 664 A.2d 518, 523 (1995)).

13. *Wiederholt III*, 89 P.3d at 778 (Conclusions of Law of Disciplinary Board) (citations omitted).

pointed questions from the Board, where he went wrong, and how he believes things are now different and unlikely to go wrong again. To every such question Mr. Wiederholt equivocates:

> I wasn't a bad person. I made some real mistakes in judgment. For reasons of— but for pride and arrogance, I either chose not to look at. I don't believe I had then, or have now, a deep seated psychological difficulty with telling the truth. . . .
>
> . . . .
>
> I do not believe that I was less a decent person then, and I'm certainly capable of making a right decision. And I can't tell you, except for—as to time and experience, as far beyond the practice of law, that have made me realize that as smart, as slick as I thought I was back then, that I wasn't. And if I had to look at a single issue, I couldn't give you any. It's been a long time.
>
> . . . .
>
> So if I had to guess—if I had to go back and analyze it, it was my inability to see a bigger more global picture. How my actions affected more than just my relationship between me and Mr. Metcalf. . . . I want to give you a better answer. It was an inability to see the whole picture.
>
> . . . .
>
> . . . [B]ut for my excesses, I believe that I was a good lawyer, which is to say my clients were (indiscernible).

Given that Mr. Wiederholt has devoted untold hours to his pursuit of reinstatement, and given that he has known, at least since the Supreme Court's opinion in 2001, what standard would be applied to the issue of reinstatement, he could have been expected to formulate the best possible answer to the fundamental question, what did you do wrong and how do we know you won't do it again? His vague, equivocal answers under these circumstances leave the Board with the uncomfortable conviction that Mr. Wiederholt is still unable to formulate an acceptable answer to that most basic of questions, an answer that would assure the Board that he has the current moral fitness to be readmit-

ted to the practice of law. Mr. Wiederholt has failed to sustain his heavy burden of persuasion on this issue.

**C. Proof that the Petitioner's return to the practice of law will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive of the public interest.**

The ultimate issue, whether Petitioner's return to the practice of law will not jeopardize the Bar, the administration, or the public interest, is also inextricably related to his acceptance of wrongdoing, and his present moral fitness. Being unable to find that Mr. Wiederholt accepts his wrongdoing with honesty and sincerity, or that he has the present moral fitness to be readmitted to the practice of law, the Board cannot perforce find that his readmission will not jeopardize the interests of the Bar, justice, or the public. While Mr. Wiederholt has, as many have commented, many talents and many positive qualities, the equivocal and contradictory nature of his explanations for the events that lead to his disbarment leave the Board unconvinced. Because the standard of proof is by clear and convincing evidence, this is considerably short of that standard.

## CONCLUSION

The Disciplinary Board concludes that Mr. Wiederholt has failed to meet his burden of proof to show his entitlement to reinstatement to the Bar. The Board recommends to the Supreme Court that he not be readmitted to the practice of law at this time.

DATED this 7th day of June, 2007 at Anchorage, Alaska.

Allison Mendel
Member
Disciplinary Board

Joined by: Joe Faulhaber, Chris Cooke, John Tiemessen, Michael Hurley, William Granger

Not participating: Phillip Pallenberg, Mitch Seaver

*In re Wiederholt*

Matthew W. Claman, joined by Sidney K. Billingslea and Jason A. Weiner, dissenting,

In 2002, disbarred attorney Jon Wiederholt petitioned for reinstatement. An Area Hearing Committee recommended that the Alaska Supreme Court reinstate Mr. Wiederholt. A divided Board of Governors, acting in its role as Disciplinary Board, recommended against reinstatement. Mr. Claman dissented from that recommendation:

> Viewing the evidence in light of the *Pier* factors, it appears that Wiederholt has sought to satisfy these 10 factors, and the Board has then responded by explaining that Wiederholt's efforts to satisfy these factors is simply not good enough.

> In short, I believe the majority is looking for reasons to deny Wiederholt's re-application for re-admission in light of compelling and largely uncontradicted evidence that supports his readmission.

*In re Wiederholt*, 89 P.3d 771, 793 (Alaska 2004) (*Wiederholt III* ).

By a 2–1 vote, two justices not participating, the supreme court adopted the recommendation of the Disciplinary Board and denied Mr. Wiederholt's petition for reinstatement. *Wiederholt III*, 89 P.3d at 771. Justice Carpeneti dissented:

> I have concluded that Wiederholt has met the high standards that we determined in *Wiederholt II* that the law imposes for reinstatement. . . . Almost ten years have elapsed since the original discipline in this case was imposed. Because Jon Wiederholt has met the standards for reinstatement, I believe that his petition for reinstatement should be granted.

*Wiederholt III*, 89 P.3d at 799–800 (Carpeneti, J., dissenting).

In 2006, Mr. Wiederholt again petitioned for reinstatement. The Area Hearing Committee again recommended reinstatement. Almost 13 years have passed since the supreme court disbarred Mr. Wiederholt. A divided Disciplinary Board again recommends against reinstatement. We dissent from the Disciplinary Board's recommendation.

The written record submitted to the Disciplinary Board overwhelmingly supports reinstatement. The weakness that the majority identifies in recommending against reinstatement is Mr. Wiederholt's testimony under oath before the Disciplinary Board. One can reasonably criticize Wiederholt's responses as being unpolished and imperfect. Viewing this testimony in the context of the strong record that supports reinstatement, however, we do not believe that the imperfections in Mr. Wiederholt's testimony are sufficient to overcome the strong record in favor of reinstatement.

For the reasons set forth above, the reasons set forth in Mr. Claman's dissent in *Wiederholt III*, and the reasons articulated by Justice Carpeneti in *Wiederholt III*, the court should reject the Disciplinary Board's recommendation. The court should approve Wiederholt's petition for admission subject to a reasonable period of supervised practice.

2 July 2007

> Matthew W. Claman
> Disciplinary Board Member

Joined by Sidney K. Billingslea and Jason A. Weiner.

## APPENDIX B

### BEFORE THE ALASKA BAR ASSOCIATION
### AREA HEARING COMMITTEE
### THIRD JUDICIAL DISTRICT

In The Reinstatement Matter Involving

> JON E. WIEDERHOLT,

> Petitioner.

ABA Membership No. 8312172

ABA File No.2006R001

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATIONS OF AREA HEARING COMMITTEE

On September 11, 2006, a hearing was held before the Area Hearing Committee Panel (the "Panel") assigned to hear the above-referenced Petition for Reinstatement. Based upon the testimony of the witnesses, the record of the prior proceedings, the brief-

ing and arguments of counsel and all other matters in the record, the Panel hereby makes the following Findings of Fact and Conclusions of Law, and Recommendations to the Disciplinary Board:

## FINDINGS OF FACT

1. Petitioner, Jon E. Wiederholt, was disbarred from the practice of law in the State of Alaska by Order of the Alaska Supreme Court, dated July 8, 1994. The factual basis and circumstances leading to the Court's action are set forth in the case of *In Re Disciplinary Matter Involving Wiederholt* (*"Wiederholt I"*), 877 P.2d 765 (Alaska 1994).

2. Since the date of his disbarment in 1994, Petitioner has filed four Petitions for Reinstatement with the Alaska Bar Association. This is Petitioner's fourth Petition for Reinstatement. The procedural history of this matter is summarized below for ease of reference:

| Date | Pleadings | Action |
|---|---|---|
| 33947 | Area Hearing Panel's Decision on Bar Association Grievances | Upheld Grievances |
| 34021 | Area Hearing Panel's Findings and Recommendations on Sanctions | Recommended Disbarment |
| 34129 | Disciplinary Board's Recommendations | Adopts Hearing Panel's Recommendation of Disbarment |
| 34522 | Alaska Supreme Court Decision 877 P.2d 765 (Alaska 1994) ("**Wiederholt I**") | Affirms Disciplinary Board's Recommendation of Disbarment |
| 36332 | **1st Petition for Reinstatement** | |
| 36558 | Area Hearing Panel's Decision on 1st Petition for Reinstatement | Recommended Denial of Reinstatement |
| 36594 | Disciplinary Board's Findings, Conclusions, and Recommendation on 1st Petition for Reinstatement | Adopts Findings and Conclusions of Area Hearing Committee, and Recommends Denying Reinstatement |
| 37056 | Alaska Supreme Court Decision 24 P.3d 1219 (Alaska 2001) ("**Wiederholt II**") | Affirmed Disciplinary Board's Decision Denying Reinstatement |
| 37313 | **2nd Petition for Reinstatement** | |
| 37573 | Area Hearing Panel's Findings of Fact, Conclusions of Law, and Recommendations of Area Hearing Committee Panel | Recommended Reinstatement |
| 37752 | Disciplinary Board's Recommendation on 2nd Petition for Reinstatement | Rejects Area Hearing Committee's Recommendation; Recommends Denying Reinstatement |
| 38159 | Alaska Supreme Court Decision 89 P.3d 771 (Alaska 2004) ("**Wiederholt III**") | Affirmed Disciplinary Board's Decision Denying Reinstatement |
| 38507 | **3rd Petition for Reinstatement** | |
| 38547 | Alaska Supreme Court | Rejected or Dismissed 3rd Petition as untimely under Bar Rule 29 |
| 38829 | **Motion for Summary Reinstatement filed with Alaska Supreme Court** | |
| 38889 | Alaska Supreme Court | Denied Summary Reinstatement and Remanded to Bar Association for further proceedings |
| 38897 | **Motion for Summary Reinstatement—4th Petition for Reinstatement** | |
| 39020 | Area Hearing Panel's Decision on 4th Petition for Reinstatement | Majority recommends reinstatement |

3. Prior to the hearing in this matter, Petitioner filed a motion for summary judgment "regarding psychiatric stability and fitness to practice." The motion requested to summarily establish five elements with respect to Petitioner's reinstatement: (1) that sufficient time has elapsed since his prior hearing in 2002 to adequately evaluate Petitioner's mental health for purposes of these proceedings; (2) that Petitioner has fully complied with the supreme court's directive to seek, obtain and successfully complete counseling; (3) that Petitioner was mentally fit to practice law as of the hearing in 2002; (4) that Petitioner was mentally fit to practice law as of Dr. Wolf's September 2004 affidavit; and (5) that Petitioner is today fully mentally fit and capable of practicing law. The Panel deferred a ruling on this motion until after the hearing.

4. More than five years has passed since Petitioner's disbarment in 1994, and the Petitioner was last denied reinstatement on 6/22/04. Pursuant to Alaska Bar Rule 29(c)(2), more than two years must pass before the petitioner can seek reinstatement after a reinstatement petition has been denied. As more fully set out in Conclusion of Law No. 1, the Hearing Panel finds that, pursuant to Alaska Bar Rule 29(b)(5), more than two years has passed since "the effective date of the Court's most recent order denying reinstatement," and therefore, Petitioner is factually and legally eligible to be considered for readmission to the practice of law.

### Summary of Testimony

5. Petitioner presented testimony from several witnesses at the hearing, who testified to the following:

a. *Josh Fink.* Mr. Fink is the head of the Office of Public Advocacy ("OPA") and has employed Mr. Wiederholt as a Paralegal II for approximately two years. During that time, Mr. Wiederholt's duties have included performing criminal case assignments, legal research and drafting, as well as supervising the civil paralegal I, and assisting her with the child-in-need-of-aid and juvenile delinquency cases. According to Mr. Fink, Mr. Wiederholt divulged his disbarment background during his initial interview for the paralegal position, and at that time, appeared to be remorseful for his bar difficulties. Because Mr. Fink was not previously aware of Mr. Wiederholt's disbarment history, Mr. Fink then specifically followed up and researched Wiederholt's background regarding the disbarment, and subsequently decided to hire Mr. Wierderholt as the criminal paralegal for the office. Upon hiring Mr. Wiederholt, Mr. Fink placed Mr. Wiederholt on probation for six months, because he was concerned about the conduct discussed in the Court opinions, and wanted to see if Wiederholt's performance matched the Court's discussed behavior, or rather matched or was consistent with Mr. Fink's reading of Wiederholt's apparent rehabilitation. Mr. Fink testified that Wiederholt "passed [his probation] with flying colors," so Mr. Fink made Wiederholt's paralegal position permanent. In his daily duties, Mr. Wiederholt performs criminal case intake, conflict checks with the public defender, contact with agency contract counsel, and has substantial contact with clients, many of whom were incarcerated. When asked if Mr. Fink would be comfortable sending this type of conflict work to Mr. Wiederholt should he be reinstated and subsequently left the agency to work independently, Mr. Fink testified:

I would. He's worked with criminal clients, my most difficult clients who call regularly. They're often unhappy with their counsel, their counsel they're not paying for. And many of them have mental health issues and substance abuse issues and will call repeatedly and same complaints, and he has worked with them well. He is patient, listened to them, been a calming influence in many cases, directs them where they need to go, briefs me to the extent I need to be briefed so I can contact them and follow up. He's done a good job working with the clients.

Despite the trying nature of the client contact, Mr. Fink observed that Mr. Wiederholt always treated the clients with "respect

and dignity," which, Mr. Fink explained, was not always an easy task. Mr. Fink further stated that Mr. Wiederholt was better at communicating with the clients than some of the attorneys in the office.

With regard to how Mr. Wiederholt handled the high stress environment in the OPA office, Mr. Fink stated:

> ... [i]t can be a fairly high-stress environment in our office with many demands on your time, not the least of which is responding to these clients. And he ... I mean, I've witnessed it in a very stressful situations where we're just swamped and overloaded. He has maintained a professional demeanor and handled himself with the clients very well and interacted with them very well.

Mr. Fink indicated that part of his job as the OPA supervisor is to evaluate the performance of numerous OPA employees, and that in the past, he has had to fire some employees. Mr. Fink testified that Mr. Wiederholt is a very good employee who has excellent research and writing skills, and that if Mr. Wiederholt was reinstated, Mr. Fink would be willing to initially refer OPA misdemeanor and Class C felony cases to Mr. Wiederholt as outside legal counsel, until he gained more experience. Mr. Fink stated that he believed Mr. Wiederholt's acceptance of his wrongdoing was sincere, and that he had "no reservations" in recommending Mr. Wiederholt for reinstatement.

b. *William Gamble.* Mr. Gamble works full-time as an air traffic controller at the FAA in Anchorage, and also is the District Fire Emergency Services Chief for the Matanuska–Susitna Borough. He supervises two fire departments, which include four fire stations and approximately 40–60 paid and on-call volunteer responders. Mr. Gamble testified about his work relationship with Mr. Wiederholt, and stated that he first met Mr. Wiederholt in August 2000, when Mr. Wiederholt began volunteer work as an Emergency Medical Technician I, and has continued to work with Mr. Wiederholt up to the present time. Mr. Gamble testified that in addition to Mr. Wiederholt's full-time day job at OPA in Anchorage, Mr. Wiederholt works three evening shifts per week (6:00 p.m. to 6:00 a.m., Tuesday, Saturday, and Sunday) as a volunteer EMT in the Valley. Chief Gamble stated that during the last six years, Mr. Wiederholt has continued his EMT training, so that now Mr. Wiederholt is one of the few volunteers who has achieved the EMT III level, as well as being trained as a "rescue technician" who is qualified to use the "jaws of life" in automobile crash situations. In addition, Mr. Wiederholt has also started additional training as a firefighter.

Regarding Mr. Wiederholt's quality of work, Mr. Gamble testified that Mr. Wiederholt wears a 24–hour pager, and "will always go on call and will stay until the work is done." Mr. Gamble testified that "Jack is the go-to guy" in the department, who is always willing to do the difficult assignments. Mr. Gamble further testified that Mr. Wiederholt has spent "thousands of hours since 2000" working as a volunteer medic, and is now a lead medic in the department. Mr. Gamble stated that his paramedics regularly experience extremely stressful situations on a daily basis. He has been with Mr. Wiederholt in numerous life-and-death situations, and has observed that Wiederholt handles stress "better than most," and has always acted in a rational manner and never showed any anger management issues. Mr. Gamble has found Mr. Wiederholt to be compassionate, patient, and understanding of the patient's pain, and believes that "Jack is the last person to quit working on a patient." Mr. Gamble stated that as paramedics, he and his crew are constantly placed in danger from patients who are often violent due to meth labs, injury or drug overdose, and because of this, they take care of each other. Based upon Mr. Gamble's work experience with Wiederholt as a paramedic, Gamble testified that he would trust Mr. Wiederholt with his (Gamble's) life.

Mr. Gamble testified that in the last six months, he has discussed with Mr. Wiederholt his actions that resulted in his disbarment, and that Gamble believes Mr. Wiederholt took unqualified responsibility for his actions in those conversations, and did not blame others for his mistakes. Mr. Gamble believes that the disbarment was a humbling

experience for Mr. Wiederholt, and that in his (Gamble's) opinion, he believes that Mr. Wiederholt has sufficient moral backbone to be reinstated as a lawyer.

c. *Laurel Peterson.* Mr. Peterson is an attorney in Anchorage and has been admitted to practice since 1974. He served as a District Court Judge in the mid–70's, and has been in private practice since then. He has known Mr. Wiederholt since approximately 1993, and has testified twice before on his behalf. Prior to 1994, he had contact with Mr. Wiederholt as opposing counsel, and found Mr. Wiederholt to be "overly aggressive" and "harsh," both personally and in his written work. After Mr. Wiederholt's disbarment, Mr. Wiederholt began to work for Mr. Peterson as a paralegal performing research and writing. At the beginning of their association, Mr. Wiederholt's legal writing was not up to Mr. Peterson's standards, in that the writing was overly harsh and aggressive, and personally attacking to opposing counsel. Over the years of their association, Mr. Peterson has counseled Mr. Wiederholt on neutralizing his writing style, and believes that Mr. Wiederholt has listened and incorporated these suggestions, and ultimately has changed his writing style, so that Mr. Peterson has continued to use Mr. Wiederholt on several projects. And, although the press of work created stressful situations at times, Mr. Peterson never observed Mr. Wiederholt to exhibit an anger management problem. Mr. Wiederholt has expressed remorse to Mr. Peterson for the conduct leading to his disbarment, which Mr. Peterson believes to be sincere. Over the last six years of working very closely with Mr. Wiederholt, Mr. Peterson believes that Mr. Wiederholt has been rehabilitated, and has the legal ability, skills, and moral fitness to be reinstated to the practice of law. Mr. Peterson believes that Mr. Wiederholt's disbarment has caused Wiederholt to learn to reflect on his conduct, which has had a beneficial effect on Petitioner. Mr. Peterson does not believe that the public is at risk if Mr. Wiederholt is reinstated.

d. *Ron Offret.* Mr. Offret is an attorney and partner in the law firm of Aglietti, Offret, and Woofter, and has been admitted to practice since 1974. Mr. Offret testified that he did not become acquainted with Mr. Wiederholt until the last 10 years, after the disbarment. He testified that he has had Mr. Wiederholt work with him performing legal research and writing on a few cases, and that Petitioner is currently assisting him with an appeal to the 9th Circuit Court of Appeals. He has not previously testified in any Wiederholt proceeding. He has found Mr. Wiederholt's work to be competent and thorough. Mr. Offret was familiar with Mr. Wiederholt during his first and second petitions for reinstatement, and believes that in the intervening years, that Mr. Wiederholt has changed. Mr. Offret trusts Mr. Wiederholt and believes him to be an honest person, and testified that he would hire him as a lawyer in his office. He believes that Mr. Wiederholt has accepted responsibility for his past actions, and that he has the moral fitness to be reinstated to the practice of law. Mr. Offret does not believe that reinstatement would be detrimental to the bar, public, or the administration of justice.

e. *Robert Woofter.* Mr. Woofter is an attorney and partner in the law firm of Aglietti, Offret, and Woofter, and has been admitted to practice in Alaska since 1986. He has known Mr. Wiederholt since the mid–80's, and at that time, found him abrasive, arrogant, and difficult to deal with, describing him as "a real jerk." He became reacquainted with Mr. Wiederholt in 2002, when Mr. Wiederholt began working with other attorneys in Woofter's office, and in course of Petitioner's working on cases in the office, found Mr. Wiederholt's legal skills more than competent. Mr. Woofter testified that when Mr. Wiederholt began working in the office, he was a bit wary of him, and that in their discussions about Mr. Wiederholt's disbarment situation, he (Woofter) consciously tried to determine if Wiederholt was truly remorseful, or only sorry because he got caught. After working with and observing Mr. Wiederholt over the last few years, Mr. Woofter testified that he personally found Mr. Wiederholt to be forthcoming about the facts of his disbarment, and felt that Wiederholt has really shown true remorse. He also believes that he can now see an element of

compassion in Wiederholt's personality that was not there before. In Mr. Woofter's opinion, he believes that Mr. Wiederholt is morally fit to return to the practice of law and does not believe that any harm would happen to the Bar Association or the public if Wiederholt was reinstated.

f. *Lisa Behrens.* Ms. Behrens also works for the FAA in Anchorage and as an EMT in the Mat–Su Valley. She has known Mr. Wiederholt since 2002, and became acquainted with him when he was her EMT instructor. During the course of their EMT work together, they have become romantically involved. Once she learned of his disbarment, she researched and read the Alaska Supreme Court legal cases and familiarized herself with the underlying conduct leading to the disbarment. She has discussed the disbarment situation with Mr. Wiederholt and he has expressed remorse which she believes is sincere, in that he accepted responsibility and understood that other people got hurt from his conduct. She testified that as EMT IIIs, they handle many types of stressful situations, including responding to emergency calls where they routinely clean up vomit, urine, and other body fluids, and often are unable to save patients. Through their EMT work together, she has had many opportunities, including life-and-death situations, to observe how Mr. Wiederholt handles stress, and believes he handles stress very well. She agrees that Mr. Wiederholt is the "go-to guy" in the department, in that he does not avoid combative patients and does not "cherry-pick" the easy emergency calls. She testified that he has always treated the patients with patience and respect, and has never seen him exhibit anger problems. In Ms. Behrens experience, she has not seen Mr. Wiederholt exhibit the type of conduct discussed in the previous court cases, and believes that it is "highly unlikely" that he would repeat similar conduct.

g. *Aaron Wolf.* Dr. Wolf is a psychiatrist in Anchorage, where he has practiced for many years. He has submitted materials and testified in every disbarment and reinstatement proceedings involving Mr. Wiederholt. He first evaluated Mr. Wiederholt at the request of the Alaska Bar Association in the context of the disbarment proceeding in approximately 1992. In that proceeding, he testified that Mr. Wiederholt suffered from a personality disorder that caused him to be rigid, hostile, lacking in trust, and making it difficult for him to compromise. When confronted with disagreement over issues, Petitioner could become aggressive and argumentative. Subsequently, Dr. Wolf performed a further evaluation on Mr. Wiederholt in 1999, this time at Mr. Wiederholt's request, to support his first petition for reinstatement. In the 1999 report, Dr. Wolf stated that in his opinion, Mr. Wiederholt had improved medically, and could return to the practice of law, but Dr. Wolf recommended that he be supervised and not practice alone. In response to the first petition for reinstatement, the Alaska Supreme Court denied Wiederholt's ... petition in 2001. Shortly thereafter, and in response to the Court's comments in the opinion, Mr. Wiederholt then began professional counseling on a once or twice a month basis, with Dr. Wolf.

Mr. Wiederholt then filed a second petition for reinstatement in 2002, and Dr. Wolf again met with Mr. Wiederholt to prepare his evaluation. Dr. Wolf then testified at the second petition for reinstatement hearing in 2002, and provided a third opinion concerning Mr. Wiederholt's progress. During the 2002 hearing, Dr. Wolf testified that Mr. Wiederholt had matured in the previous 10 years since the disbarment hearing. Mr. Wiederholt had initiated his paramedic training, and had progressed from an EMT I to an EMT II at that point, and was learning how to be part of a team and be on the giving side of others. Dr. Wolf felt that Mr. Wiederholt had made significant changes in his life, and had grown as an individual since 1999, and now felt that Mr. Wiederholt would be safe to practice law and act as a sole practitioner. In Dr. Wolf's opinion, Mr. Wiederholt was symptom-free, and that mental health-wise, there was no medical impediment to Mr. Wiederholt's reinstatement.

With regard to the current fourth petition for reinstatement, Dr. Wolf again was contacted by Mr. Wiederholt to perform an up-

dated evaluation of him as of 2006. Dr. Wolf testified that he had met with Mr. Wiederholt for several sessions in order to evaluate his mental health status and provide his opinions during this reinstatement hearing. Dr. Wolf testified that as of the 2006 evaluation, he found Mr. Wiederholt to exhibit a calmer demeanor and to be "doing very well from a mental health standpoint," and that "he doesn't need any mental health intervention." In the course of their counseling sessions, Dr. Wolf believed that Mr. Wiederholt had fully accepted responsibility for the harm he caused to clients, other lawyers, the Bar Association, and the public in general. Dr. Wolf stated,

> Mr. Wiederholt ... has done a great deal of maturing over these years. The diagnosis of personality disorder is one that if you take a snapshot, it's not supposed to go away, if you will. But what I've seen with Mr. Wiederholt is that sort of snapshot of my initial thing [sic] showed somebody who was in an immense amount of turmoil, not functioning very well. And then by the time that I then saw him at the end of the 90's and from now on has really matured, grown up, not showing any of that behavior and/or types of thinking that he had 15, 16 years before.

And, regarding Mr. Wiederholt's ability to deal with a stressful environment, Dr. Wolf went on to state:

> He now has a history of working for Mr. Fink and his agency in a pressure cooker kind of environment and, at least according to Mr. Wiederholt, he has been enjoying that and his perception is that he's been doing well in that without any rising of the old kinds of feelings.

In Dr. Wolf's opinion, there was no medical reason why Mr. Wiederholt could not return to the practice of law.

h. *Jon Wiederholt.* Mr. Wiederholt testified in this proceeding, and on many points, his testimony was similar to the testimony given in previous reinstatement proceedings. His testimony in this proceeding differed from his testimony in 2002 because he appeared either to have gained more insight into the reasons for his prior miscon-

duct, or was better able to communicate his feelings about his lack of previous insight. He testified that he believed that his personality characteristics of arrogance and "pridefulness" contributed to his past misconduct, and that he hoped he was a better person now than he was then. In attempting to explain his prior demeanor and misconduct towards others, he stated:

> ... if I could step out of my skin and look back at myself, if you derive a measure of success from being a bully in law and you keep having success because you do that, it doesn't change. You get worse. So the time to get it is—is early on.... The problem lies in getting that lawyer to listen, which was my problem.

When asked by counsel if he still felt that his arrogance and "pridefulness" were qualities that caused his misconduct, Wiederholt stated:

> I guess that I would add to that some measure of blindness. I—my oldest son, no offense, but I see in him a person that was very much like the person I was, where I knew more than anyone could tell me and I was right and no one could tell me otherwise. And I think—so there's a measure of blindness in there. Maybe it's—maybe it's arrogance, I suppose, or maybe it's the fear of being wrong, or admitting it.

Wiederholt went on to further explain that he believed his self-enforced isolation from other attorneys may also have contributed to his misconduct and errors in judgment:

> And you know, there's some analogies, at least I see with my oldest boy, about what maybe should have happened with me, which I wish could have. And insulating myself from colleagues or, you know, practicing law by myself. And I mean that in the sense of—I didn't ask for permission and I didn't speak to colleagues. So in some sense, I guess I analogize it to a child that needs to have a painful enough lesson to realize that they really don't know anything.

Wiederholt testified that he felt sincere regret about the harm he caused to his clients, the Court, the Bar, and the public, stating:

Actually, what I regret is two things. I regret the harm that it caused and I think in some sense to a greater degree, what I regret more so is my inability to see that. Throughout his testimony, Wiederholt appeared to exhibit a greater understanding of "the bigger picture" of the law. In response to Bar counsel, Petitioner stated:

> Well, if you draw bright-line distinctions between did I get a just result or did I win for my client. I think that was part and parcel the mistake that I made when I practiced, is that I took the black-and-white view that you're suggesting that there is. And I don't—I don't see it that way. I don't see it as being—I win and you lose. In this proceeding, I don't see that you win if I don't get readmitted. I don't see that I win if I do. I mean, if—if we do what we're supposed to do as lawyers, it isn't supposed to be a win or lose. It's supposed to—we're supposed to get the right result. We're not going to have people that are happy with it, but we wouldn't have people happy with it if we were referees at a soccer game.

And, when asked by Bar counsel what tools or skills he would bring to the practice of law, if reinstated, to prevent a recurrence of the previous abusive behavior that may have been exacerbated by stress, Wiederholt answered and referenced incidents from his Sunday paramedic duty that occurred the previous day, before the reinstatement hearing. He and Chief Gamble had previously testified about the loss of two patients (a man and a small infant, on whom he performed CPR for 45 minutes, where both attempts to revive the patients were unsuccessful). In response to Mr. Van Goor's question, Wiederholt testified:

> Drawing from other parts of my life, Mr. Van Goor, there is nothing we do as attorneys—this is what I didn't see before. There's nothing that we do as attorneys that warrants the kind of response I had before, other than perhaps some sort of personal satisfaction I might take in making the other side feel bad. But when you deal with things that—that I—that I've trained for and, like most recently yesterday, dealt with, like I say, it just makes

what we do as attorneys, in a global sense, not so worth the emotional response.

> . . . .

> ... But I think that my experiences with things that are so much more life-altering, if that's the right way to say it, I just can't take myself quite so seriously.

Additionally, Wiederholt's testimony appeared to illustrate that his experiences of working with other lawyers and as a paralegal with OPA, caused him to talk to, and deal with, other clients and lawyers who may have acted like he had towards others in the past, which helped him to realize, and "really regret [the kind of person] that I must have been."

## CONCLUSIONS OF LAW

1. *Jurisdiction to Maintain this Action.* Alaska Bar Rule 29(b)(5) provides as follows:

> ... An Attorney who has been disbarred by order of the Court may not be reinstated until the expiration of at least five years from the effective date of the disbarment. Unless otherwise ordered by the Court, an attorney who has been denied reinstatement by the Court from disbarment or suspension may not file a petition for reinstatement until the expiration of at least two years from the effective date of the Court's most recent order denying reinstatement.

Petitioner was disbarred on July 8, 1994. His second petition for reinstatement was denied by the Alaska Supreme Court on June 22, 2004, in *Wiederholt III,* and was the "most recent order denying reinstatement." Wiederholt then filed a "Motion for Summary Reinstatement" directly with the Alaska Supreme Court on April 23, 2006, which was before the expiration of the two-year waiting period after the effective date of the Court's most recent order denying reinstatement on June 22, 2004. The Court subsequently denied Petitioner's Motion for Summary Reinstatement on June 22, 2006, and referred the matter to the Bar Association, to consider the matter as a petition for reinstatement pursuant to Alaska Bar Rule 29(c). The current motion for summary reinstatement, now considered petitioner's fourth petition for reinstatement in this proceeding, was referred to the Bar Association on June

22, 2006, exactly two years since the effective date of the Court's previous order denying reinstatement. Therefore, under Alaska Bar Rule 29(b)(5), the Panel finds that Wiederholt is legally qualified to maintain and pursue this fourth petition for reinstatement.

2. Under Alaska Bar Rule 29(c)(1), an attorney who has been disbarred for more than two years must file a petition for reinstatement with the Bar Association and prove by clear and convincing evidence that (1) "he has the moral qualifications, competency, and knowledge of law required for admission to the practice of law in the State and that his resumption of the practice of law in the State will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive of the public interest[.]"

3. The Alaska Supreme Court expanded on the legal standards which must be met for reinstatement in *Wiederholt II*, the Court adopted certain legal principles in analyzing a petition for reinstatement. Specifically, the court found that (1) there is a presumption against reinstatement, and (2) the Petitioner has the burden of proof in the proceeding, and must show by clear and convincing evidence that he has satisfied the standards for reinstatement.

The *Wiederholt II* court also identified the ten factors listed in *In re Pier*, 561 N.W.2d 297, 299 (S.D.1997), as providing useful guidance in any reinstatement inquiry. The *Pier* standards for reinstatement include the following:

(a) The nature and seriousness of the original misconduct.

(b) The Petitioner's conduct following the discipline.

(c) The time elapsed since the original discipline.

(d) The extent of the Petitioner's rehabilitation.

(e) The Petitioner's character, maturity, and experience at the time of the discipline and at present.

(f) Restitution.

(g) The Petitioner's acceptance of wrongdoing with sincerity and honesty.

(h) The Petitioner's current competency and qualifications to practice law.

(i) The Petitioner's present moral fitness.

(j) Proof that the Petitioner's return to the practice of law will not be detrimental to the integrity and standing of the Bar or the administration of justice, or subversive of the public interest.

4. The Panel has analyzed the evidence presented and has applied the *Pier* factors as follows:

(a) *The nature and seriousness of the original misconduct.* The Panel finds the Petitioner's original misconduct to be within the class of the most serious type of misconduct that would justify disbarment. The conduct involved dishonesty (forging another's signature on a check), intentional written and oral misrepresentations to the Court, Bar Counsel, and Disciplinary Board, verbally abusive conduct towards counsel and witnesses, physical assault against opposing counsel, and obstructionist and abusive discovery tactics in litigation practice. The aggravators of this conduct include the fact that it occurred over a several year period of time involving several incidents and people. A mitigating factor is the fact the conduct which is the subject of these proceedings happened a long time ago, beginning in approximately 1986–1987, and ending in the early 1990's, over fourteen years ago.

(b) *The Petitioner's conduct following the discipline.* Since the date of Mr. Wiederholt's disbarment in 1994, he has been employed in the legal field, although he has not practiced law since his disbarment. He has worked in construction, as a limousine driver, paralegal, Emergency Medical Technician I, II, and III, and is currently training to become a firefighter. Since August 2000, he has volunteered thousands of hours performing EMT work in the Mat–Su Valley, and is considered a "lead medic" and "go-to-guy" by the Chief of the Department. He is also held in high regard by the many senior attorneys for whom he has worked. In sum,

Mr. Wiederholt has used the time since his disbarment to continue to maintain and improve his legal skills, as well as to initiate and pursue training in the new field of emergency medicine. The Panel finds that Mr. Wiederholt has used the time since his disbarment in a constructive manner and has contributed back to the community through his volunteer EMT work.

(c) *The time elapsed since the original discipline.* The conduct at issue here occurred over a span of several years, beginning in approximately 1986–1987, almost twenty years ago, and ending in the early 1990's, over fourteen years ago. The Petitioner was disbarred in July 1994, over twelve years ago. The initial five year disbarment period has been followed by an additional period of seven years, which, in conjunction with his previous reinstatement denials, has allowed, or forced, Petitioner to take additional time to consider the seriousness of his conduct and the consequences, and hopefully, to reflect upon the reasons that motivated him to behave in the manner that originally got him into trouble. The additional two year period of disbarment since the last denial of reinstatement in *Wiederholt III* in 2004, in particular, appears to have allowed Petitioner to gain additional insight into the nature of his previous conduct. The Committee Panel finds that this additional two year period performed a concrete rehabilitative function by providing Petitioner with an additional opportunity to take his blinders off and to learn to see outside of himself.

(d) *The extent of the Petitioner's rehabilitation.* As previously stated, Mr. Wiederholt has continued to work in the legal field as a contract lawyer performing work for senior attorneys. Through their mentoring, the evidence has established that Mr. Wiederholt has improved his legal writing techniques so that he refrains from including personal attacks in his written briefing. All of the attorneys who testified, including Mr. Fink as a current supervisor, stated that Mr. Wiederholt presents a calmer and more professional demeanor than the behavior they either personally experienced in the mid-

80's, or described by the Court in *Wiederholt I*. Mr. Wiederholt has also participated in mental health counseling with Dr. Wolf in approximately 2002 for approximately 14–18 sessions, and recently underwent an additional evaluation in preparation for this proceeding. Lastly, Mr. Wiederholt has also continued his rehabilitative efforts by progressing with his EMT training to the EMT III level, and with his contribution of working "thousands of hours" as a paramedic since 2000. He also has apologized to the persons affected by his conduct. In the Panel's view, Mr. Wiederholt has established by clear and convincing evidence that he has made substantial efforts to accomplish the goal of rehabilitation and is rehabilitated.

(e) *The Petitioner's character, maturity, and experience at the time of the discipline and at present.* Part of the troubling aspect of this case is trying to understand the reasons for Petitioner's underlying misconduct which resulted in disbarment. The Panel agrees that the misconduct was not merely a product of Petitioner being a new or inexperienced lawyer, but rather appears to have been caused by a combination of factors, including extreme immaturity, rigidity, and isolation. In the time since the imposition of the discipline to the present, Petitioner has matured in his emotional development, has trained to learn a new and demanding EMT profession, and has worked with a variety of lawyers. All of these activities have benefited Petitioner, caused him to mature, and contributed to his rehabilitation.

(f) *Restitution.* Although monetary restitution was not an issue in this matter, Petitioner certainly has the responsibility to provide some type of "moral" restitution to the people affected by his conduct. Although Petitioner initially failed to perceive the need to make full apologies during his disbarment period prior to his first petition for reinstatement, he did take guidance from the Court's opinion in *Wiederholt II* and has made both written and verbal apologies to the persons involved. Although it would have been preferable for Petitioner to have realized on his own, from his own inner conscience or moral compass, that apologies to the people he hurt were obviously necessary in order to show

remorse, prove rehabilitation, and establish that he had "learned his lesson," the Panel does not find that the fact that the apologies were made in direct response to the Court's opinion diminishes the fact that they were made. The Panel accepts Petitioner's testimony that, although it took him awhile, he finally did understand the necessity of apologizing to his victims, and that he made sincere efforts to do so.

(g) *Acceptance of Wrongdoing with Honesty and Sincerity.* All of Petitioner's witnesses testified that he accepted his past wrongdoing with honesty and sincerity. From a review of the record, it appeared as though during the initial term of his disbarment, Mr. Wiederholt appeared to focus only on the ending date of his disbarment as a time when he would get his license to practice back, rather than working through, or accepting, his role in the debacle. He appeared to misdirect his efforts on arguing to get his license to practice law back, rather than proving that he had reformed and had acquired the necessary qualities to be able to perform properly as a lawyer. His disbarment time would have been better spent receiving professional medical counseling to discover what personality traits and emotional reasons caused him to act in the way he did. Mr. Wiederholt clearly appeared to be in denial for years about the seriousness of his disbarment misconduct, and only because of the rejections of his reinstatement requests, did he finally realize that he was not presenting himself in a light in which the Disciplinary Board or Court could have confidence, and that perhaps he needed to change.

In the present reinstatement hearing, a majority of the Panel finds that Mr. Wiederholt established his acceptance of his past wrongdoing with honesty and sincerity. In addition to the witnesses who provided credible evidence of their unqualified opinions regarding his sincere remorse, a majority of the Panel was persuaded that Mr. Wiederholt does feel honestly and sincerely sorry about his prior misconduct. Mr. Wiederholt appeared to honestly assess and discuss his difficulty in gaining insight into himself, and

seemed to realize that he suffered in the past from a sort of "blindness" and inability to see how his conduct affected others. In the Panel's view, it appears as though the passage of time since his disbarment and his increased maturity have allowed him to develop the necessary introspective skills which will prevent similar misconduct in the future.

(h) *The Petitioner's current competency and qualifications to practice law.* The Panel finds that Petitioner has established by clear and convincing evidence that he currently possesses the requisite competency and qualifications to practice law. Numerous witnesses testified that Petitioner has excellent legal analytical skills and is competent and qualified to practice law. In the past four years, Petitioner has been working as a contract paralegal for several Anchorage attorneys who have extensive legal experience, including Terry Aglietti, Ron Offret, Laurel Peterson, and Robert Woofter. All testified that Petitioner was competent, and that his writing skills had improved and were more professional. In addition, in the last two years, Petitioner has worked as a paralegal for the Office of Public Advocacy under the supervision of Josh Fink. Mr. Fink testified that during his employment at the agency, Petitioner has performed legal research and writing for him, and in his opinion, possessed the legal skills necessary to practice law. All of the attorneys who testified stated that they would be willing to hire Petitioner as an attorney based upon his legal reasoning ability and writing skills.

(i) *Present Moral Fitness.* A majority of the Panel finds by clear and convincing evidence that Petitioner has proved that he has the present moral fitness to be reinstated to the practice of law. The senior attorneys who have worked with him over several years have all testified that Mr. Wiederholt is morally fit to return to the practice of law. Mr. Fink, who did not know of Mr. Wiederholt or his previous disbarment until he interviewed him, formed his opinion of Mr. Wiederholt over the last two years that Petitioner has worked for him. Mr. Fink testified that Wiederholt was an excellent employee and communicated with some of the most difficult clients better than some of the

attorneys in the OPA office, and always exhibited a professional and patient demeanor towards others. Mr. Fink stated that he would be happy to hire Mr. Wiederholt as an attorney if Petitioner was reinstated to practice law. Additionally, Chief Gamble has worked with Mr. Wiederholt over the last six years as a paramedic. Mr. Wiederholt has worked his way up from an entry level EMT I to where he now is a lead medic as an EMT III and a rescue technician. He has observed Mr. Wiederholt numerous times administer to patients who were in a life-threatening situation (some of whom died), and stated that he always observed Mr. Wiederholt act in a very patient and professional manner. Lastly, Dr. Wolf testified that his opinion of Mr. Wiederholt's mental health now in 2006 differs from his opinion of Petitioner in 1992. Dr. Wolf believes that Mr. Wiederholt has matured and is functioning well, and he has not seen any evidence of the types of thinking or behavior Petitioner previously exhibited. In Dr. Wolf's opinion, there is no medical reason why Mr. Wiederholt could not return to the practice of law. Based upon the evidence presented, the Panel finds that Petitioner has established by clear and convincing evidence that he is presently morally fit to return to the practice of law.

(j) *Proof that the Petitioner's return to the practice of law will not be detrimental to the integrity and standing of the Bar or the administration of justice, or subversive of the public interest.* A majority of the Panel finds by clear and convincing evidence that Petitioner's return to the practice of law will not be detrimental to the integrity and standing of the Bar, the administration of justice, or subversive of the public interest. Because of the seriousness of Petitioner's underlying misconduct, including forgery, and his repeated petitions for reinstatement which were denied due to his failure to either accept the seriousness of his misconduct or to perceive the need to apologize and make positive amends for his behavior, there may always be a concern about whether Petitioner can ever provide enough evidence or guarantee that he will not re-offend. And while some may believe that Petitioner should never be eligible to be reinstated based upon his prior misconduct, the legal standards in Bar Rule 29 and the *Pier* factors in *Wiederholt I* provide standards, which if met by clear and convincing evidence, allow a petitioner to be reinstated. The evidence presented here by the Petitioner establishes that he has excellent legal skills, is a hard worker, is helpful in discussions concerning tactics and strategies, and is highly thought of by his past and current employers, all of whom would be willing to hire him in the future and recommend him for reinstatement. Petitioner's mental health professional finds no medical reason why he cannot return to the practice of law. Petitioner has apologized to the victims of his misconduct. And lastly, he has worked in a non-legal volunteer capacity providing thousands of hours of paramedic work to the public for the past six years.

Although one cannot predict the future, taken all together, a majority of the Panel finds that under Alaska Bar Rule 29(c)(1), Petitioner has established by clear and convincing evidence that he has the moral qualifications, competency, and knowledge of law required for admission to the practice of law, and that his resumption of the practice of law in this state will not be detrimental to the integrity and standing of the Bar, the administration of justice, or subversive to the public interest.

5. With respect to Petitioner's motion for summary judgment regarding psychiatric stability and fitness to practice, the Committee Panel grants the motion in part, and finds with regard to issue # 1, that sufficient time has elapsed since Mr. Wiederholt's 2002 hearing to adequately evaluate his mental health for purposes of this proceeding, and on issue # 5, that at the present time of this hearing, Mr. Wiederholt is mentally fit and capable of practicing law. The Panel denies summary judgment on the remaining issues # 2, # 3, and # 4, as we believe these issues are either outside the purview of this committee and/or not germane to the issues before this committee panel.

## RECOMMENDATION

Therefore, based upon the forgoing, a majority of the Panel recommends that Petitioner be reinstated to the practice of law.

DATED this 31st day of October, 2006, at Anchorage, Alaska.

ALASKA BAR ASSOCIATION

/s/ ———————
Martha Beckwith, Chair
Attorney Member
Area Hearing Committee

/s/ ———————
Carol Stolpe
Public Member
Area Hearing Committee

---

BEFORE THE ALASKA BAR ASSOCIATION
AREA HEARING COMMITTEE
THIRD JUDICIAL DISTRICT

In The Reinstatement Matter Involving

JON E. WIEDERHOLT,

    Petitioner.

---

ABA Membership No. 8312172
ABA File No.2006R001

## DISSENT

Because I still harbor doubts about the Petitioner's reinstatement, I respectfully dissent from the views of my colleagues on the committee.

The *Pier* factors [1] frame my analysis of Petitioner's case and his application for reinstatement. While my views are not easily compartmentalized within the various *Pier* factors, I believe several are at issue:

    1. Petitioner's acceptance of wrongdoing with sincerity and honesty;

    2. The nature and seriousness of the original misconduct; and

    3. Proof that Petitioner's return to the practice of law will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive of the public interest.

In reviewing Petitioner's case, I'm also guided by the axiom that, while courts should be slow to disbar, they should be even slower to reinstate.[2] Further, any significant doubt about whether an applicant for reinstatement has sustained their burden must be resolved in favor of protecting the public interest by denying reinstatement.[3]

## *DISCUSSION*

After almost 28 years of practice in this jurisdiction, primarily in the field of litigation, I do not consider my approach to the practice of law to be genteel. Nonetheless, I am stunned by the severity of the conduct for which Petitioner was disbarred, which admittedly took place 15–19 years ago. The details of that misconduct are amply set forth in the record,[4] and I will not recount them here. The supreme court summarized it as follows:

> As this court's opinion and the attached appendices in his disbarment case indicate, Wiederholt engaged in numerous and repeated instances of misconduct over a span of four years, including committing criminal forgery, assaulting opposing counsel, engaging in abusive discovery tactics, using threatening language towards opposing counsel, and writing a threatening letter to an unrepresented claimant on behalf of a

---

1. *In re Pier*, 561 N.W.2d 297 (S.D.1997). *See also In re Wiederholt ("Wiederholt II ")*, 24 P.3d 1219, 1225 (Alaska 2001).

2. In 2004, the last full year for which statistics are available from the American Bar Association online, there were approximately 1,320,000 lawyers with an active license within the U.S. (2,753 in Alaska). There were 529 lawyers publicly sanctioned and disbarred that year; another 411 attorneys were publicly sanctioned and disbarred by consent. In 2004, there were 580 petitions for reinstatement and/or readmission filed in the U.S.; only 50 petitions were granted for lawyers who had previously been disbarred.

3. *Wiederholt II* at page 1223.

4. *See In Re Wiederholt ("Wiederholt I ")*, 877 P.2d 765 (Alaska 1994) (in particular the findings of the Disciplinary Board attached at Appendices A and B).

client. All of these, taken together, demonstrate a pattern of serious misconduct.... [5]

Mr. Wiederholt was not a novice at the time these events occurred; he received his license to practice in 1983. He worked at the firm of a former supreme court justice for three years before going off on his own, which is when the events in question occurred.

There is some suggestion that perhaps Mr. Wiederholt had an anger management problem. However, that does not explain all of his conduct. He was abusive towards opposing counsel; he was abusive towards his own clients; and he was abusive to the process. While anger undoubtedly caused him to strike out in certain respects, other aspects of his conduct were obviously deliberate and premeditated.

Despite what I would characterize as overwhelming proof of his misconduct and ample grounds for his disbarment, Mr. Wiederholt pursued the matter to the Alaska Supreme Court. The Court made short shrift of his arguments and the disciplinary action was affirmed in *Wiederholt I*.

After all this, one would have hoped that Mr. Wiederholt would have been chastened by his experience, and reflect upon his behavior. Five long years passed before Mr. Wiederholt was eligible to apply for reinstatement. People can grow and mature over time and I would have thought, indeed expected, that Mr. Wiederholt would have exhibited some level of contrition for what he had done and turn over a new leaf. However, that was not the case. As the supreme court observed:

> The transcript of Wiederholt's testimony is replete with examples demonstrating that he has little remorse for his previous actions and has no consciousness or understanding of the nature or extent of his past wrongdoing.

> During his testimony, Wiederholt continued to maintain that his past conduct did not warrant disbarment and that the board

and this court wrongly decided at least some of the charges against him, including the *Nesbett* grievance, in which he was disciplined for deceiving the court about whether a client's judgment had been satisfied. Wiederholt stated that he did not believe that he acted unethically and that he simply believed the board and this court defined unethical conduct differently than he did. Rather than stating that he has acknowledged his past mistakes and will change in the future, he simply stated to the panel that "I accept full responsibility for the conclusions that the committee and the supreme court ultimately reached.... [W]hile I believed that my conduct did not warrant disbarment, it is a conclusion that the bar rightfully or wrongfully reached." He further stated that he "deeply regret[s] the findings that the court came to and"— not that he regretted his actions—and reemphasized that he "had a different understanding of what happened."

Even when he did acknowledge that he behaved in an unethical, unprofessional manner, Wiederholt still attempted to defend his actions. At the hearing, Wiederholt admitted that his act of kicking opposing counsel ... was "stupid," "unethical," and "wrong." However, he then went on to minimize and justify his actions by stating that [opposing counsel] was bigger and heavier than he was and that [opposing counsel] had started the incident. He also insinuated that [opposing counsel] deserved what he received.

The board found the fact that Wiederholt did not apologize to several of his victims to be a significant indicator of his lack of remorse for his previous actions, and consequently, a lack of understanding of his prior wrongdoing.[6]

Petitioner applied for reinstatement again, approximately 15 months after the decision in *Wiederholt II*. Although several apologies were then issued in writing, and some were conveyed orally according to the Petitioner's testimony, there is nothing in the record by any of the victims or participants that ac-

---

5. *Wiederholt II* at page 1229 (footnote omitted).

6. *Wiederholt II* at page 1229–30.

knowledges these apologies, or offer support for Petitioner's reinstatement.

Following his second reinstatement hearing the Disciplinary Board rejected the unanimous findings of the Area Hearing Committee and recommended denial of his reinstatement. A divided supreme court affirmed.[7]

Petitioner then filed yet a third petition, which was apparently withdrawn because two years had not elapsed since his prior application.

Which brings us to the current petition. I listened very carefully to Mr. Wiederholt's testimony, and that of his witnesses. From reviewing the transcripts of prior hearings, the presentation was not substantially different; several of the witnesses testified at previous hearings, and they continue to support Mr. Wiederholt's application. The only added dimension is his recent career as an emergency medical technician (EMT); several witnesses testified about that aspect of Petitioner's development.

Dr. Wolf testified on Petitioner's behalf, again. Personally, I afforded little weight to his testimony. Through no fault of his own it appears that Dr. Wolf did not have an opportunity to retrieve Mr. Wiederholt's file from his prior clinic, and therefore he was frankly not refreshed about the details of his case and his prior treatment with Mr. Wiederholt. Moreover, Dr. Wolf also testified at the 1999 hearing in support of Mr. Wiederholt, and his professional conclusions were substantially at odds with the findings of the supreme court in terms of Mr. Wiederholt's level of remorse.

It appears to me that the wounds suffered by Mr. Wiederholt are not completely healed. Not only is he deeply invested in his reinstatement, he has been deeply involved in the reinstatement efforts on his own behalf. For instance, he stated that he "pretty much wrote … all" of the pleadings involved in his last hearing in 2002 and strongly implied that he prepared all the pleadings associated with this 2006 proceeding. That is certainly is his prerogative. However, the point is that

those pleadings still reflect an edge and a bitterness that was somewhat belied by his testimony.

In contrast to the hard edge of the pleadings associated with his current reinstatement effort, petitioner professes now to have a serene attitude about the role of an advocate in our legal system:

Q. Well, isn't it true that in any given legal situation, at least 50 percent of the people in the room are hoping that you fail as a lawyer for your client?

A. Well, if—if you draw bright-line distinctions between did I get a just result or did I win for my client. I think that was part and parcel the mistake that I made when I practiced, is that I took that black-and-white view that you are suggesting that there is. And … I don't see it that way. I don't see it as being—I win and you lose. In this proceeding, I don't see that you win if I don't get readmitted. I don't see that I win if I do. I mean, if—if we do what we're supposed to do as lawyers, it isn't supposed to be a win or lose. It's supposed to—we're supposed to get the right result. We're not going to have people that are happy with it, but we wouldn't have people happy with it if we were referees at a soccer game.

(Trans.: Page 197)

This testimony troubles me. I don't believe clients are simply looking to let the chips fall where they may. They expect to prevail. Civil Rule 82 requires a finding as to the prevailing party. Before a party can prevail, many obstacles must be overcome, not the least of which is the ingenuity and skill of opposing counsel, all of which is difficult to predict. The point is that the client has the right to expect zealous advocacy on their behalf, not someone acting as a "referee." I think they have the right to expect that their attorney will do what is necessary, within the confines of the ethical rules.

I have doubts about Mr. Wiederholt's ability to provide vigorous representation given his present attitude about his role as an advocate. I can certainly understand why he projects a detachment from the rough and

---

7. *In re Wiederholt ("Wiederholt III ")*, 89 P.3d     771 (Alaska 2004).

tumble aspects of litigation. That was the context in which most of his prior transgressions occurred, giving rise to the offenses for which he was disbarred. However, in my view, that detachment, if sincere, is potentially "detrimental to the integrity and standing of the bar or the administration of justice...."

I'm also troubled by the comparison to Mr. Wiederholt's role and duties as an EMT:

Q. But isn't it true that the stress dealing with the life and death situations that you've dealt with are different from the stress that one would face in the practice of law?

A. I would certainly hope that it's different.

Q. Okay. Different in the respect that you really don't have an opposing counsel firing off angry letters to you, angry emails, I guess, to update the technology, or filing pleadings directly attacking you. I mean, it's—in the situations that you work at or work on as an emergency medical technician, you don't have an opponent, do you?

A. Yes, sir, I do.

Q. What's your opponent?

A. Yesterday, a man died on me and a six-month-old baby girl that I did ... 45 minutes worth of CPR on my very first opportunity ever to get in an ambulance for 45 minutes. Yes, Mr. Van Goor, I had an opposition.

Q. But nobody ...

A. I mean, I didn't have a person standing up there and telling me that I'm an evil bad person, no. But if ... you're asking me to draw distinctions between the morality I represent as a medic or the morality that I represent as an attorney, I don't see a big, significant difference.

Q. Okay. Well ...

A. I don't know that I can ... draw distinctions between the stress of a legal practice or the stress of ... doing what I do as a medic.

First of all, I want to acknowledge that by all accounts Mr. Wiederholt performs exemplary service as an EMT, and he is to be commended for the sacrifices he makes and the services he renders to the community.

However, I respectfully disagree that the stresses he encounters are comparable to those in the law. Nothing compares to the preservation of life and efforts to preserve life performed under extraordinary and harrowing situations.

On the other hand, the stresses encountered in a law practice are often, quite frankly, trivial. Quibbling between opposing counsel over unimportant issues, fighting over matters that are, in the grand scheme of things, not germane—these are stressful and aggravating precisely because they are so trivial, but these common and every day disputes caused the petitioner trouble in the past.

Has petitioner matured and grown to the point where the mundane stresses of a law practice would not affect his judgment or temperament? I frankly don't know. Would his experience as an EMT tend to make him more patient and understanding about the often-insignificant disputes that can arise between counsel? Again, I don't know, but I have my doubts. His EMT experience stands on its own and, as I noted, it is a very worthy and meritorious endeavor on his part. However, the practice of law is different and his EMT experience, while ennobling, does not lend weight to his petition for reinstatement.

In conclusion, this has been a difficult case for me, and I have thought long and hard about my responsibilities as a committee member. The practice of law is a privilege, not a right. It is easy for me to be unforgiving of Mr. Wiederholt based upon the egregious conduct he exhibited, albeit some 15–19 years ago. There was no excuse or explanation for that conduct then except what I can only characterize as a character flaw. His relentless efforts to be reinstated have also been flawed to some extent, and I am simply not convinced that he has truly learned the lessons from his past. I give him credit for going on with a life in which he has demonstrated many other admirable qualities and is

making a genuine contribution to society. However, with respect to returning to him the privilege of practicing law in an unsupervised setting, I continue to harbor doubts that prevent me from approving his application for reinstatement, and therefore I dissent.[8]

/s/ _____
Michael C. Geraghty
Attorney Member
Area Hearing Committee

---

**8.** Because I do not believe that Mr. Wiederholt's psychiatric stability is an issue, I join the Committee Panel's granting of summary judgment on this issue. For the reasons expressed, I continue to have doubts about the extent of his sincerity, and his temperament and judgment to be an attorney.